[16 NE3d 538, 992 NYS2d 480]

In the Matter of NEW YORK STATEWIDE COALITION OF HISPANIC CHAMBERS OF COMMERCE et al., Respondents, v NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE et al., Appellants.

Argued June 4, 2014; decided June 26, 2014

**POINTS OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel*, New York City (*Richard Dearing, Fay Ng, Leonard J. Koerner, Pamela Seider Dolgow, Mark Muschenheim, Jasmine M. Georges, Spencer Fisher, Zachary W. Carter* and *Trevor D. Lippman* of counsel), for appellants. I. The New York City Board of Health is a unique

body with authority to issue substantive rules and standards, and its broad authority emanates from state law. (*Matter of LaGuardia v Smith*, 288 NY 1; *Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344; *Matter of Council of City of N.Y. v Public Serv. Commn. of State of N.Y.*, 99 NY2d 64; *Matter of Finegan v Cohen*, 275 NY 432; *Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc. v New York State Pub. Empl. Relations Bd.*, 6 NY3d 563; *People ex rel. Knoblauch v Warden*, 216 NY 154; *Grossman v Baumgartner*, 17 NY2d 345; *Matter of Schulman v New York City Health & Hosps. Corp.*, 38 NY2d 234; *Paduano v City of New York*, 45 Misc 2d 718.) II. The adoption of the Portion Cap Rule was a proper exercise of the New York City Board of Health's regulatory authority. (*Dorst v Pataki*, 90 NY2d 696; *Matter of Allstate Ins. Co. v Rivera*, 12 NY3d 602; *Clark v Cuomo*, 66 NY2d 185; *Matter of Nicholas v Kahn*, 47 NY2d 24; *Boreali v Axelrod*, 71 NY2d 1; *Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation*, 71 NY2d 186; *Paduano v City of New York*, 45 Misc 2d 718, 24 AD2d 437, 17 NY2d 875; *People v De Jesus*, 54 NY2d 465; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340; *Statharos v New York City Taxi & Limousine Commn.*, 198 F3d 317.) III. The Portion Cap Rule is consistent with the New York City Board of Health's enabling legislation. Since petitioners failed to demonstrate that the Portion Cap Rule was so lacking in reason and not supported by any evidence, the rule should be upheld. (*Nunez v Giuliani*, 91 NY2d 935; *Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.*, 2 NY3d 249; *Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health*, 85 NY2d 326; *Matter of Catholic Med. Ctr. of Brooklyn & Queens v Department of Health of State of N.Y.*, 48 NY2d 967; *Price v New York City Bd. of Educ.*, 16 Misc 3d 543, 51 AD3d 277; *Matter of Legislature of County of Rockland v New York State Pub. Serv. Commn.*, 49 AD2d 484; *Grossman v Baumgartner*, 17 NY2d 345; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340; *New York State Rest. Assn. v New York City Bd. of Health*, 556 F3d 114.)

*Latham & Watkins LLP* (*Richard P. Bress*, of the District of Columbia bar, admitted pro hac vice, *William K. Rawson*, of the District of Columbia bar, admitted pro hac vice, *Lori Alvino McGill, Michael E. Bern*, of the District of Columbia bar, admitted pro hac vice, *Kala Sherman-Presser*, of the District of Columbia bar, admitted pro hac vice, and *Andrew D. Prins* of counsel), *Latham & Watkins, LLP*, New York City (*James E.*

*Brandt* of counsel), for The American Beverage Association, *Weil, Gotshal & Manges, LLP*, New York City (*James W. Quinn, Salvatore A. Romanello* and *Gregory Silbert* of counsel), for The National Restaurant Association, *MoloLamken LLP* (*Steven F. Molo* and *Ben Quarmby* of counsel), for The New York Statewide Coalition of Hispanic Chambers of Commerce and another, *Rivkin Radler, LLP*, Uniondale (*Evan H. Krinick, Barry I. Levy* and *Brian L. Bank* of counsel), for Soft Drink and Brewery Workers Union, Local 812, International Brotherhood of Teamsters, and *Matthew N. Greller, Esq., LLC*, Millburn, New Jersey (*Matthew N. Greller* of counsel), for The National Association of Theatre Owners of New York State, respondents. I. The New York City Board of Health is an executive agency subject to separation of powers constraints. (*Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo*, 64 NY2d 233; *Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344; *Subcontractors Trade Assn. v Koch*, 62 NY2d 422; *Matter of Broidrick v Lindsay*, 39 NY2d 641; *Matter of Zborowski*, 68 NY 88; *Romano v Bruck*, 25 Misc 406; *Matter of Casado v Markus*, 16 NY3d 329; *People v Blanchard*, 288 NY 145; *Patgin Carriages Co. Inc. v NYC Dept. of Health & Mental Hygiene*, 28 Misc 3d 1229[A], 2010 NY Slip Op 51540[U]; *Grossman v Baumgartner*, 17 NY2d 345.) II. The ban violates separation of powers. (*People ex rel. Burby v Howland*, 155 NY 270; *Boreali v Axelrod*, 71 NY2d 1; *Ellicott Group, LLC v State of N.Y. Exec. Dept. Off. of Gen. Servs.*, 85 AD3d 48; *Nassau Bowling Proprietors Assn. v County of Nassau*, 965 F Supp 376; *Rent Stabilization Assn. of N.Y. City v Higgins*, 83 NY2d 156; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340; *Matter of Motor Veh. Mfrs. Assn. of U.S. v Jorling*, 181 AD2d 83; *Statharos v New York City Taxi & Limousine Commn.*, 198 F3d 317; *Pet Professionals of N.Y. City v City of New York*, 215 AD2d 742; *Leader v Maroney, Ponzini & Spencer*, 97 NY2d 95.) III. The ban is arbitrary and capricious. (*Bluebird Partners v First Fid. Bank*, 97 NY2d 456; *Matter of Law Enforcement Officers Union, Dist. Council 82, AFSCME, AFL-CIO v State of New York*, 229 AD2d 286; *Matter of Kelly v Kaladjian*, 155 Misc 2d 652; *Matter of c/o Hamptons, LLC v Zoning Bd. of Appeals of Inc. Vil. of E. Hampton*, 98 AD3d 738; *Matter of Barry v O'Connell*, 303 NY 46; *Matter of Lansdown Entertainment Corp. v New York City Dept. of Consumer Affairs*, 74 NY2d 761; *New York State Assn. of Counties v Axelrod*, 78 NY2d 158; *Rubin v Coors Brewing Co.*, 514 US 476.)

*Andrew Goldberg,* New York City, for Wilfredo Lopez and another, amici curiae. I. There are sound public health reasons why the New York City Charter vests legislative power in the New York City Board of Health and the Charter itself does not make the Board subservient to the City Council. (*Grossman v Baumgartner,* 17 NY2d 345; *People ex rel. Knoblauch v Warden,* 216 NY 154; *Matter of Schulman v New York City Health & Hosps. Corp.,* 38 NY2d 234; *People v Blanchard,* 288 NY 145.) II. The Appellate Division's holding that the New York City Board of Health must look to the City Council for a specific directive except in the situation of a "hazard per se" is wrong as a matter of law and will severely undercut the Board's ability to react promptly and effectively to public health challenges. (*Grossman v Baumgartner,* 17 NY2d 345; *Paduano v City of New York,* 45 Misc 2d 718, 24 AD2d 437, 17 NY2d 875.) III. For the reasons stated by Judge Bellacosa in *Boreali v Axelrod* (71 NY2d 1 [1987]), the *Boreali* precedent should not be applied to the New York City Board of Health. (*Metropolitan Bd. of Health v Heister,* 37 NY 661; *People ex rel. Lieberman v Vandecarr,* 175 NY 440; *People ex rel. Knoblauch v Warden,* 216 NY 154; *People v Blanchard,* 288 NY 145; *Quaker Oats Co. v City of New York,* 295 NY 527; *Matter of Bakers Mut. Ins. Co. of N.Y. [Department of Health of City of N.Y.],* 301 NY 21; *Grossman v Baumgartner,* 17 NY2d 345; *Paduano v City of New York,* 45 Misc 2d 718; *Matter of Schulman v New York City Health & Hosps. Corp.,* 38 NY2d 234.)

*Columbia Law School, Center for Constitutional Governance,* New York City (*Gillian E. Metzger, Richard Briffault* and *Sara Haviva Mark* of counsel), for Gillian E. Metzger and others, amici curiae. I. *Boreali v Axelrod* (71 NY2d 1 [1987]) establishes a flexible and pragmatic approach that allows agency regulation under broad delegations of authority, and this Court has long upheld public health regulations under broad delegations. (*Clark v Cuomo,* 66 NY2d 185; *Bourquin v Cuomo,* 85 NY2d 781; *Matter of Richardson,* 247 NY 401; *Matter of New York State Health Facilities Assn. v Axelrod,* 77 NY2d 340; *Matter of Nicholas v Kahn,* 47 NY2d 24; *Matter of Levine v Whalen,* 39 NY2d 510; *Matter of Bologno v O'Connell,* 7 NY2d 155; *Matter of Medical Socy. of State of N.Y. v Serio,* 100 NY2d 854; *Cubas v Martinez,* 8 NY3d 611; *Matter of Chemical Specialties Mfrs. Assn. v Jorling,* 85 NY2d 382.) II. The Portion Cap Rule is a constitutional exercise of the New York City Board of Health's delegated authority under a proper *Boreali* analysis. (*New York State Rest. Assn. v New York City Bd. of Health,* 556 F3d 114;

*Massachusetts v EPA*, 549 US 497; *Williamson v Lee Optical of Okla., Inc.*, 348 US 483; *Taylor v Consolidated Edison Co. of N.Y., Inc.*, 552 F2d 39; *Montrose Parkway Alternatives Coalition v United States Army Corps of Engrs.*, 405 F Supp 2d 587; *Winnebago Tribe of Neb. v Ray*, 621 F2d 269; *Bourquin v Cuomo*, 85 NY2d 781; *Clark v Cuomo*, 66 NY2d 185; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340.) III. The Portion Cap Rule should be sustained under a nonconstitutional approach that focuses on statutory authorization and reasoned administrative decisionmaking. (*Whitman v American Trucking Assns., Inc.*, 531 US 457; *Mistretta v United States*, 488 US 361; *J. W. Hampton, Jr., & Co. v United States*, 276 US 394; *National Broadcasting Co. v United States*, 319 US 190; *FDA v Brown & Williamson Tobacco Corp.*, 529 US 120; *FCC v Fox Television Stations, Inc.*, 556 US 502; *Matter of Jewish Home & Infirmary of Rochester v Commissioner of N.Y. State Dept. of Health*, 84 NY2d 252; *Matter of Campagna v Shaffer*, 73 NY2d 237; *Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health*, 85 NY2d 326; *Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382.)

*Bromberg Law Office, P.C.*, New York City (*Brian L. Bromberg* of counsel), *ChangeLab Solutions*, Oakland, California (*Anne Pearson, Manel Kappagoda, Lindsey Zwicker* and *Amy Barsky* of counsel), and *Ohio State University College of Public Health & Moritz College of Law*, Columbus, Ohio (*Micah Berman* of counsel), for National Association of County and City Health Officials and others, amici curiae. I. The portion size rule is an example of sound, evidence-based public health practice. (*Matter of Stracquadanio v Department of Health*, 285 NY 93; *New York State Rest. Assn. v New York City Bd. of Health*, 556 F3d 114; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340.) II. The lower courts' interpretations of *Boreali v Axelrod* (71 NY2d 1 [1987]) and the arbitrary and capricious standard erroneously restrict the New York City Board of Health from implementing incremental and practical solutions to profound public health threats. (*Chiropractic Assn. of N.Y. v Hilleboe*, 12 NY2d 109; *Boreali v Axelrod*, 71 NY2d 1; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340; *Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health*, 85 NY2d 326; *Matter of Memorial Hosp. v Axelrod*, 68 NY2d 958; *Nunez v Giuliani*, 91 NY2d 935; *Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.*, 2 NY3d 249; *Grossman v Baumgartner*, 17 NY2d 345; *Williams v Mayor of Baltimore*, 289 US 36.)

*Featherstonhaugh, Wiley & Clyne, LLP*, Albany (*James D. Featherstonhaugh* of counsel), for The Business Council of New York State, Inc. and others, amici curiae. I. Upholding the soda ban would create an inoperable regulatory framework because there are numerous other local boards of health structured similarly to the New York City Board of Health that will become authorized to enact independent container size regulations. (*Justiana v Niagara County Dept. of Health*, 45 F Supp 2d 236; *Nassau Bowling Proprietors Assn. v County of Nassau*, 965 F Supp 376.) II. In New York, the New York State Legislature through the Department of Agriculture and Markets is the proper authority to regulate the container size of an otherwise legal substance. (*People v Blue Ribbon Ice Cream Co.*, 1 Misc 2d 453; *New York State Food Merchants' Assn. v Grant*, 63 Misc 2d 550.) III. The soda ban would have substantial detrimental impact on existing businesses.

*Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP*, Washington, D.C. (*Sarah R. Prins, Roy T. Englert, Jr.*, and *Alex Potapov* of counsel), and *Washington Legal Foundation* (*Cory L. Andrews* and *Richard A. Samp* of counsel), for Washington Legal Foundation and another, amici curiae. I. This Court has steadfastly prevented the executive from usurping the legislature's policy-making authority. (*Matter of Fullilove v Beame*, 48 NY2d 376; *Clark v Cuomo*, 66 NY2d 185; *Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344; *Matter of Nicholas v Kahn*, 47 NY2d 24; *Subcontractors Trade Assn. v Koch*, 62 NY2d 422; *Rapp v Carey*, 44 NY2d 157; *Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801; *Bourquin v Cuomo*, 85 NY2d 781; *Matter of Campagna v Shaffer*, 73 NY2d 237; *Matter of Small v Moss*, 279 NY 288.) II. This Court's separation-of-powers jurisprudence has deep roots in the American legal tradition. (*Wayman v Southard*, 10 Wheat [23 US] 1.) III. Vigorous enforcement of separation-of-powers principles is indispensable to liberty and sound governance. (*Matter of Small v Moss*, 279 NY 288; *Matter of Seignious v Rice*, 273 NY 44; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340; *Rapp v Carey*, 44 NY2d 157; *Matter of Citizens For An Orderly Energy Policy v Cuomo*, 78 NY2d 398; *Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801.)

*Watkins Bradley LLP*, New York City (*Adam Francois Watkins* and *Stephanie F. Bradley* of counsel), for Maria Del Carmen Arroyo and others, amici curiae. I. The New York City Board of

Health does not possess any extraordinary, legislative powers to restrict access to safe and legal foods. (*Boreali v Axelrod*, 71 NY2d 1; *Matter of Health Ins. Assn. of Am. v Corcoran*, 154 AD2d 61; *Matter of Green v Safir*, 174 Misc 2d 400; *Rodriguez v Popular Democratic Party*, 457 US 1; *Sailors v Board of Ed. of Kent Cty.*, 387 US 105; *Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344; *Matter of Trustees of Vil. of Saratoga Springs v Saratoga Gas, Elec. Light & Power Co.*, 191 NY 123; *Carr v Schmid*, 105 Misc 2d 645; *Grossman v Baumgartner*, 17 NY2d 345; *People v Weil*, 286 App Div 753.) II. The ban establishes legislative public policy that only the state or city legislature may enact. (*Metzen v United States*, 19 F3d 795.)

*King & Spalding LLP*, New York City (*David M. Fine* of counsel), and *King & Spalding LLP*, Atlanta, Georgia (*Jeffrey S. Cashdan* and *Merritt E. McAlister* of counsel), for New York State Conference of the National Association for the Advancement of Colored People and others, amici curiae. The ban's enactment violated fundamental separation-of-powers principles that reserve critical policy decisions to the legislative branch. (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801; *Boreali v Axelrod*, 71 NY2d 1; *Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344; *University of Pennsylvania v EEOC*, 493 US 182; *Loving v United States*, 517 US 748.)

*Shapiro, Arato & Isserles LLP*, New York City (*Alexandra A.E. Shapiro, Marc E. Isserles* and *Chetan A. Patil* of counsel), for The Chamber of Commerce of the United States of America and others, amici curiae. I. The New York City Board of Health failed to consider industry-led solutions and public-private partnerships as alternatives to regulation. (*Boreali v Axelrod*, 71 NY2d 1.) II. The Portion Cap Rule violates core principles of responsible regulation. (*Healy v Beer Institute*, 491 US 324.)

*Reese Richman LLP*, New York City (*Kim E. Richman* of counsel), for Paul A. Diller and others, amici curiae. I. This Court should abandon or relax the strict nondelegation canon rooted in *Boreali v Axelrod* (71 NY2d 1 [1987]). (*Whitman v American Trucking Assns., Inc.*, 531 US 457; *A. L. A. Schechter Poultry Corp. v United States*, 295 US 495; *Panama Refining Co. v Ryan*, 293 US 388; *American Textile Mfrs. Institute, Inc. v Donovan*, 452 US 490; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340; *Rent Stabilization Assn. of*

*N.Y. City v Higgins*, 83 NY2d 156; *Matter of Citizens For An Orderly Energy Policy v Cuomo*, 78 NY2d 398; *Bourquin v Cuomo*, 85 NY2d 781; *Plaut v Spendthrift Farm, Inc.*, 514 US 211; *New York State Club Assn. v City of New York*, 69 NY2d 211.) II. This Court should not apply *Boreali*'s nondelegation canon to the rule-making powers of local agencies. (*Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344; *Matter of Mooney v Cohen*, 272 NY 33; *Matter of Resnick v County of Ulster*, 44 NY2d 279; *Bareham v City of Rochester*, 221 App Div 36; *Matter of Durante v Town of New Paltz Zoning Bd. of Appeals*, 90 AD2d 866; *Dur-Bar Realty Co. v City of Utica*, 57 AD2d 51, 44 NY2d 1002; *Matter of Casado v Markus*, 16 NY3d 329.)

*Whatley Kallas, LLP*, New York City (*Patrick J. Sheehan* of counsel), and *Public Good Law Center*, Berkeley, California (*Seth E. Mermin* and *Julia Z. Marks* of counsel), for National Alliance for Hispanic Health and others, amici curiae. I. Obesity and other forms of diet-related diseases are a critical problem facing the nation and the city, especially in underserved ethnic communities. II. Consumption of sugary drinks contributes significantly to obesity, type 2 diabetes, and other chronic diseases. III. Consumption of sugary drinks, driven by targeted marketing, is significantly higher among youth and ethnic minority populations. IV. The growth in sugary drink portion sizes has matched the increase in rates of obesity and type 2 diabetes. V. Reducing consumption of sugary drinks by decreasing the default portion size can help stem the tide of obesity and diet-related diseases.

*Jones Day*, Washington, D.C. (*Anthony J. Dick, Noel J. Francisco, Ryan D. Newman, William D. Coglianese, Sarah A. Hunger* and *Matthew R. McGuire* of counsel), for Eric Lane, amicus curiae. I. The New York City Charter forbids administrative agencies from exercising unconstrained law-making authority. (*Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344; *Subcontractors Trade Assn. v Koch*, 62 NY2d 422; *Rent Stabilization Assn. of N.Y. City v Higgins*, 83 NY2d 156; *Boreali v Axelrod*, 71 NY2d 1; *Matter of Levine v Whalen*, 39 NY2d 510; *Matter of Campagna v Shaffer*, 73 NY2d 237.) II. Recent reforms to the New York City Charter remove any doubt that agencies cannot exercise unconstrained law-making authority. (*Morris v Board of Estimate*, 647 F Supp 1463, 831 F2d 384, 489 US 688.) III. Because the New York City Board of Health is an administrative agency within the

executive branch, it does not have unconstrained law-making authority. (*Boreali v Axelrod*, 71 NY2d 1; *Matter of Campagna v Shaffer*, 73 NY2d 237; *Matter of Bakers Mut. Ins. Co. of N.Y. [Department of Health of City of N.Y.]*, 301 NY 21; *Matter of Medical Socy. of State of N.Y. v Serio*, 100 NY2d 854; *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340.)

**OPINION OF THE COURT**

PIGOTT, J.

We hold that the New York City Board of Health, in adopting the "Sugary Drinks Portion Cap Rule," exceeded the scope of its regulatory authority. By choosing among competing policy goals, without any legislative delegation or guidance, the Board engaged in law-making and thus infringed upon the legislative jurisdiction of the City Council of New York.

I.

The New York City Board of Health is part of the City's Department of Health and Mental Hygiene and consists of the Commissioner of that Department, the Chairperson of the Department's Mental Hygiene Advisory Board, and nine other members, appointed by the Mayor. In June 2012, as part of its effort to combat obesity among City residents, the Department proposed that the Board amend article 81 of the City Health Code so as to restrict the size of cups and containers used by food service establishments for the provision of sugary beverages. After a preliminary vote by the Board, a notice of public hearing was published, seeking comments from the public. The substantial number of comments both before and during the July hearing indicated a groundswell of public interest and concern. On September 13, 2012, the Board voted, with one abstention, to adopt the Department's proposed rule—referred to as the "Portion Cap Rule"—to go into effect in March 2013.

The Portion Cap Rule provides in relevant part that "[a] food service establishment may not sell, offer, or provide a sugary drink in a cup or container that is able to contain more than 16 fluid ounces" and "may not sell, offer or provide to any customer a self-service cup or container that is able to contain more than 16 fluid ounces" (NY City Health Code [24 RCNY] § 81.53 [b], [c]). A "sugary drink" is defined as a nonalcoholic beverage that "is sweetened by the manufacturer or establishment with sugar or another caloric sweetener; . . . has greater than 25 calories per 8 fluid ounces of beverage; . . . [and] does

not contain more than 50 percent of milk or milk substitute by volume as an ingredient" (NY City Health Code [24 RCNY] § 81.53 [a] [1]). The Portion Cap Rule does not apply to establishments, such as supermarkets and convenience stores, that are subject to regulation and inspection by the New York State Department of Agriculture and Markets.

## II.

In October 2012, petitioners, six national or statewide not-for-profit and labor organizations, commenced this hybrid CPLR article 78 proceeding and declaratory judgment action seeking to invalidate the Portion Cap Rule. In addition to the Board of Health, the Department of Health and Mental Hygiene and its Commissioner are named as respondents.

On March 11, 2013, Supreme Court, New York County granted the petition, declared the Portion Cap Rule invalid, and permanently enjoined respondents from implementing or enforcing it. Supreme Court addressed two arguments raised by petitioners—first, whether the Board of Health had exceeded its regulatory authority "and impermissibly trespassed on legislative jurisdiction" (2013 NY Slip Op 30609[U], *11 [Sup Ct, NY County 2013]) and second, whether the Portion Cap Rule is "arbitrary and capricious" (id. at *35). The court ruled in favor of petitioners on both contentions.

With respect to the first issue, the court surveyed the history of the New York City Charter and reached the conclusion that the elective New York City Council is the sole legislative body in the City, rejecting respondents' contention that the Board of Health has inherent law-making authority. Supreme Court applied our decision in Boreali v Axelrod (71 NY2d 1 [1987]), in which we held that the New York State Public Health Council overstepped its regulatory authority when it adopted regulations prohibiting smoking in a wide variety of indoor areas open to the public that had previously been considered, but not adopted, by the state legislature. Supreme Court addressed the four considerations that we had identified in Boreali, and concluded that each of those factors weighed in favor of invalidating the Portion Cap Rule (see 2013 NY Slip Op 30609[U] at *11-34). Finally, Supreme Court found the Portion Cap Rule arbitrary and capricious, noting that "it applies to some but not all food establishments in the City, [and] it excludes other beverages that have significantly higher concentrations of sugar sweeteners and/or calories" (2013 NY Slip Op 30609[U] at *35).

The Appellate Division unanimously affirmed Supreme Court's order, also rejecting the contention that the Board has inherent legislative power, and holding that "under the principles set forth in *Boreali*, the Board of Health overstepped the boundaries of its lawfully delegated authority when it promulgated the Portion Cap Rule to curtail the consumption of soda drinks. It therefore violated the state principle of separation of powers" (110 AD3d 1, 16 [1st Dept 2013]). The Appellate Division did not reach the issue of whether the Portion Cap Rule is arbitrary and capricious.

With respect to the first *Boreali* factor, relating to whether the agency engaged in the balancing of competing concerns of public health and economic cost, thus acting on its own idea of sound public policy, the Appellate Division reasoned that the Board did not act solely with a view toward public health considerations but engaged in policymaking when it adopted the Portion Cap Rule. The court observed that the Portion Cap Rule is "especially suited for legislative determination as it involves 'difficult social problems,' which must be resolved by 'making choices among competing ends' " (110 AD3d at 11, quoting *Boreali*, 71 NY2d at 13).

With regard to the second *Boreali* factor, whether the agency created its own comprehensive set of rules without benefit of legislative guidance, the Appellate Division concluded that the Board illicitly created the Portion Cap Rule on a "clean slate," and was not merely conducting permissible interstitial rulemaking. The court noted that "the Board of Health does not dispute that neither the state legislature nor the City Council has ever promulgated a statute defining a policy with respect to excessive soda consumption" (*id.* at 13).

Turning to the third *Boreali* factor, which relates to whether the challenged rule governs an area in which the legislature has repeatedly tried to reach agreement in the face of substantial public debate and vigorous lobbying by interested factions, the Appellate Division noted that

> "[o]ver the past few years, both the City and State legislatures have attempted, albeit unsuccessfully, to target sugar sweetened beverages. For instance, the City Council has rejected several resolutions targeting sugar sweetened beverages (warning labels, prohibiting food stamp use for purchase, and taxes on such beverages). Moreover, the State Assembly

introduced, but has not passed, bills prohibiting the sale of sugary drinks on government property and prohibiting stores with 10 or more employees from displaying candy or sugary drinks at the check out counter or aisle. While the Portion Cap Rule employs different means of targeting the sale of certain beverages than those considered by the legislative bodies, it pursues the same end, and thus addresses the same policy areas as the proposals rejected by the State and City legislatures. This is a strong indication that the legislature remains unsure of how best to approach the issue of excessive sugary beverage consumption." (*Id.* at 14-15 [footnotes and internal quotation marks omitted].)

Finally, with respect to the fourth *Boreali* factor, whether the development of the rule required expertise in the field of health, the Appellate Division concluded that the Board had not "exercised any special expertise or technical competence in developing the Portion Cap Rule" (110 AD3d at 15).

We granted respondents leave to appeal (22 NY3d 853 [2013]). Subsequently, we accepted amicus briefs from a number of not-for-profit organizations, research and policy centers, and professors of law, as well as 32 individual members of the New York City Council and the New York City Public Advocate. The quantity of these submissions is an indication of the interest of the subject to diverse persons, and the briefs have been of considerable assistance to us in our deliberations. We now affirm the Appellate Division's order.

### III.

First, we address respondents' claim that the Board, having been created by the state legislature, has legislative powers separate and apart from the City Council. The City Charter unequivocally provides for distinct legislative and executive branches of New York City government. The City Council is the sole legislative branch of City government; it is "*the* legislative body of the city. . . . vested with the legislative power of the city" (NY City Charter § 21 [emphasis added]; *accord Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 356 [1985]; *Subcontractors Trade Assn. v Koch*, 62 NY2d 422, 427 [1984]). The New York State Constitution mandates that, with an exception not applicable here, "[e]very local government . . . shall have a legislative body elective by

the people thereof" (NY Const, art IX, § 1 [a]; *see also* Municipal Home Rule Law § 2 [7]), and that elective body in New York City is the City Council.[1]

Respondents, however, contend that the Board of Health is a unique body that has inherent legislative authority. We disagree. The provision of the City Charter principally cited by respondents—setting out the authority of the Board to "add to and alter, amend or repeal any part of the health code, . . . [to] publish additional provisions for security of life and health in the city and [to] confer additional powers on the [Department of Health and Mental Hygiene] not inconsistent with the constitution, laws of this state or this charter" (NY City Charter § 558 [b])—reflects only a regulatory mandate, not legislative authority. It is true that the Board "may embrace in the health code all matters and subjects to which the power and authority of the [Department of Health and Mental Hygiene] extends" (NY City Charter § 558 [c]) and that the Charter refers to the Board's supervision over "the reporting and control of communicable and chronic diseases and conditions hazardous to life and health" and "the abatement of nuisances affecting or likely to affect the public health" (NY City Charter § 556 [c] [2]; *see also* § 556 [c] [9] [referring to Board's authority to "supervise and regulate the food and drug supply of the city and other businesses and activities affecting public health in the city"]). Nonetheless, the Charter contains no suggestion that the Board of Health has the authority to create laws. While the Charter empowers the City Council "to adopt local laws . . . for the preservation of the public health, comfort, peace and prosperity of the city and its inhabitants" (NY City Charter § 28 [a]), the Charter restricts the Board's rulemaking to the publication of a health code, an entirely different endeavor.

Moreover, the language in section 558 (c) of the Charter—describing the Board's purview as comprising "all matters and subjects" within the authority of the Department of Health and

---

1. We are aware that historically the City Council once shared legislative functions with the body known as the Board of Estimate, notwithstanding the language of the Charter (*see generally Board of Estimate of City of New York v Morris*, 489 US 688 [1989] [declaring the voting system of the Board of Estimate unconstitutional]). In November 1989, however, the voters of New York City approved changes to the Charter that eliminated the Board of Estimate, thus making the City Council "the sole legislative body of the City" (Frederick A. O. Schwarz, Jr. & Eric Lane, *The Policy and Politics of Charter Making: The Story of New York City's 1989 Charter*, 42 NYL Sch L Rev 723, 828 [1998]).

Mental Hygiene—was included in 1979 to preclude the Board from attempting to regulate areas not related to health. At that time, the City's Committee on Health became concerned that "[r]egulations passed by the Board of Health may be overly broad and so invade the [province] of the City Council's legislative authority" (Rep of Comm on Health in Favor of Approving and Adopting a Local Law to Amend the New York City Charter in relation to Defining Powers of Board of Health, Local Law Bill Jacket, Local Law No. 5 [1979] of City of NY). The Committee proposed a bill to clarify the Board's authority, which was passed by the City Council in February 1979 and approved by the Mayor the following month (Local Law No. 5 [1979] of City of NY, amending NY City Charter § 558 [c]). Far from indicating a wide legislative jurisdiction, as respondents contend, section 558 (c) was intended to ensure that the Board of Health not regulate too broadly.

Respondents offer no practical solution to the difficulties that would arise from treating the Board and the City Council as coequal legislative bodies. On respondents' theory, it is unclear what the law in New York City would be were the Board to pass a health "law" that directly conflicted with a local law of the City Council. It is no solution to this difficulty that the state legislature could step in to resolve such a conflict. In short, it is clear from the Charter that the Board's authority, like that of any other administrative agency, is restricted to promulgating "rules necessary to carry out the powers and duties delegated to it by or pursuant to federal, state or local law" (NY City Charter § 1043 [a]). A rule has the force of law, but it is not a law; rather, it "implements or applies law or policy" (NY City Charter § 1041 [5] [i]).

Respondents point out our passing references to the Board's "legislative authority" in *Grossman v Baumgartner* (17 NY2d 345, 351 [1966] [upholding Board's former rule prohibiting tattooing by non-physicians]) and in a footnote in *Matter of Schulman v New York City Health & Hosps. Corp.* (38 NY2d 234, 237 n 1 [1975]). A more accurate description is found in the words we used to describe the Board's rule earlier in the *Grossman* opinion: "an administrative regulation which is legislative in nature" (17 NY2d at 349).

Another of our cases cited by respondents, *People v Blanchard* (288 NY 145 [1942]), held that the Board may make it an offense to keep "unwholesome poultry" and a defendant may be convicted of a misdemeanor for violating that Sanitary Code

regulation. But *Blanchard* stands for the proposition that, even though the Board does *not* possess "substantive law-making power" (*id.* at 147) and "has not been licensed to define any criminal offense" (*id.* at 148), it may pass a regulation with criminal consequences because "it is the city charter . . . and the Penal Law . . . that make any violation of the Sanitary Code a misdemeanor" (*id.*). *Blanchard* emphasizes the Board's regulatory, as opposed to law-making, capacity.

## IV.

Given our position that the Board's role is regulation, not legislation,[2] the next issue raised in this appeal is whether the Board properly exercised its regulatory authority in adopting the Portion Cap Rule. The parties and the lower courts correctly analyze this question by using the conceptual framework of *Boreali*. Because a doctrine of "separation of powers [is] delineated in the City Charter" (*Under 21, Catholic Home Bur. for Dependent Children*, 65 NY2d at 353; *see also id.* at 356), *Boreali* provides the appropriate framework.

*Boreali* sets out four "coalescing circumstances" present in that case that convinced the Court "that the difficult-to-define line between administrative rule-making and legislative policy-making ha[d] been transgressed." (*Boreali*, 71 NY2d at 11.) We explained that "[w]hile none of these circumstances, standing alone, is sufficient to warrant the conclusion that the [Public Health Council] has usurped the Legislature's prerogative, all of these circumstances, when viewed in combination, paint a portrait of an agency that has improperly assumed for itself the open-ended discretion to choose ends" that is the "prerogative[ ] of [a] Legislature" (*id.* at 11, 18 [internal quotation marks and square brackets omitted]).

As the term "coalescing circumstances" suggests, we do not regard the four circumstances as discrete, necessary conditions that define improper policymaking by an agency, nor as criteria that should be rigidly applied in every case in which an agency is accused of crossing the line into legislative territory. Rather we treat the circumstances as overlapping, closely related factors that, taken together, support the conclusion that an agency

---

**2.** It appears that the dissenting Judges do not disagree. Notably, the dissent, at the conclusion of a survey of legislative history and case law touching on the Board's powers, concludes *not* that the Board's authority is legislative, but that it is "at least 'nearly legislative' " (dissenting op at 709; *see also id.* at 710 [referring to the Board's "authority to regulate" and its "regulations"]).

has crossed that line. Consequently, respondents may not counter petitioners' argument merely by showing that one *Boreali* factor does not obtain.

Any *Boreali* analysis should center on the theme that "it is the province of the people's elected representatives, rather than appointed administrators, to resolve difficult social problems by making choices among competing ends" (71 NY2d at 13). The focus must be on whether the challenged regulation attempts to resolve difficult social problems in this manner. That task, policymaking, is reserved to the legislative branch.

## V.

In *Boreali*, the Court initially pointed out that the Public Health Council's scheme for protecting nonsmokers indicated its "effort to weigh the goal of promoting health against its social cost and to reach a suitable compromise." We took this to violate the principle that "[s]triking the proper balance among health concerns, cost and privacy interests . . . is a uniquely legislative function" (*Boreali*, 71 NY2d at 12). We reasoned that "to the extent that the agency has built a regulatory scheme on its own conclusions about the appropriate balance of trade-offs between health and cost to particular industries in the private sector, it was acting solely on its own ideas of sound public policy and was therefore operating outside of its proper sphere of authority" (*id.* [internal quotation marks and square brackets omitted]). Here, similarly, the Appellate Division noted that the Board of Health included exemptions and other indicators of political compromise in its Portion Cap Rule, notably the exclusion of food service establishments subject to the State Department of Agriculture and Markets. The Appellate Division interpreted this as evidence that the Board was engaged in policymaking, rather than simply in protecting the health of New York City residents.

However, the promulgation of regulations necessarily involves an analysis of societal costs and benefits. Indeed, cost-benefit analysis is the essence of reasonable regulation; if an agency adopted a particular rule without first considering whether its benefits justify its societal costs, it would be acting irrationally. We stated as much in *Boreali*, noting that "many regulatory decisions involve weighing economic and social concerns against the specific values that the regulatory agency is mandated to promote" (*Boreali*, 71 NY2d at 12). Therefore, *Boreali* should not be interpreted to prohibit an agency from attempting to

balance costs and benefits.[3] Rather, the *Boreali* court found that the Public Health Council had "not been given any legislative guidelines at all for determining how the competing concerns of public health and economic cost are to be weighed" (*id.*).

■ Here, instead of an outright ban on sugary beverages, the Board decided to reduce their consumption by the expedient of limiting maximum container size, thus making it less convenient for consumers to exceed recommended limits. The more cautious approach, however, does not save the Portion Cap Rule. By restricting portions, the Board necessarily chose between ends, including public health, the economic consequences associated with restricting profits by beverage companies and vendors, tax implications for small business owners, and personal autonomy with respect to the choices of New York City residents concerning what they consume. Most obviously, the Portion Cap Rule embodied a compromise that attempted to promote a healthy diet without significantly affecting the beverage industry. This necessarily implied a relative valuing of health considerations and economic ends, just as a complete prohibition of sugary beverages would have. Moreover, it involved more than simply balancing costs and benefits according to preexisting guidelines; the value judgments entailed difficult and complex choices between broad policy goals—choices reserved to the legislative branch.

Significantly, the Portion Cap Rule also evidenced a policy choice relating to the question of the extent to which government may legitimately influence citizens' decision-making. In deciding to use an indirect method—making it inconvenient, but not impossible, to purchase more than 16 fluid ounces of a sugary beverage while dining at a food service establishment— the Board of Health rejected alternative approaches, ranging from instruction (i.e. health warnings on large containers or near vending machines) to outright prohibition. This preference for an indirect means of achieving compliance with goals of healthier intake of sugary beverages was itself a policy choice, relating to the degree of autonomy a government permits its citizens to exercise and the ways in which it might seek to modify their behavior indirectly.

---

**3.** Even assuming, for the sake of argument, that the Board's exemption of food service establishments subject to the Department of Agriculture and Markets was a matter of choice rather than necessity, the limited scope of the Portion Cap Rule would not in itself demonstrate that it amounted to policy-making.

By choosing between public policy ends in these ways, the Board of Health engaged in law-making beyond its regulatory authority, under the first *Boreali* factor. Notably, such policymaking would likely not be implicated in situations where the Board regulates by means of posted warnings (e.g. calorie content on menus) or by means of an outright ban of a toxic substance (e.g. lead paint). In such cases, it could be argued that personal autonomy issues related to the regulation are nonexistent and the economic costs either minimal or clearly outweighed by the benefits to society, so that no policymaking in the *Boreali* sense is involved.

To apply the distinction between policymaking and rulemaking, a court is thus required to differentiate between levels of difficulty and complexity in the agency's task of weighing competing values. For example, when an agency regulates the purity of drinking water, or prohibits the use of interior lead paint, or requires guards in the windows of high-rise apartments housing children, it chooses among ends (e.g. a landowner's convenience and short-term profit versus the safety, health and well-being of tenants), but the choices are not very difficult or complex. This is because the connection of the regulation with the preservation of health and safety is very direct, there is minimal interference with the personal autonomy of those whose health is being protected, and value judgments concerning the underlying ends are widely shared.

By contrast, when an agency in our present time either prohibits the consumption of sugary beverages altogether or discourages it by regulating the size of the containers in which the drinks are served, its choices raise difficult, intricate and controversial issues of social policy. Few people would wish to risk the physical safety of their children who play near high-rise apartment windows for the sake of unobstructed views. However, the number of people who overindulge in sugary drinks, at a risk to their health, is clearly significant. An agency that adopts a regulation, such as the Portion Cap Rule or an outright prohibition of sugary beverages, that interferes with commonplace daily activities preferred by large numbers of people must necessarily wrestle with complex value judgments concerning personal autonomy and economics. That is policymaking, not rulemaking.

## VI.

With respect to the second *Boreali* factor, respondents are unable to point to any legislation concerning the consumption of

sugary beverages by the state legislature or City Council that the Portion Cap Rule was designed to supplement. Although "[t]he Legislature is not required in its enactments to supply agencies with rigid marching orders" and the legislative branch may, while declaring "its policy in general terms by statute, endow administrative agencies with the power and flexibility to fill in details and interstices and to make subsidiary policy choices consistent with the enabling legislation" (*Matter of Citizens For An Orderly Energy Policy v Cuomo*, 78 NY2d 398, 410 [1991]), the policy choices made here were far from "subsidiary." Devising an entirely new rule that significantly changes the manner in which sugary beverages are provided to customers at eating establishments is not an auxiliary selection of means to an end; it reflects a new policy choice. In short, this is not a case in which "the basic policy decisions underlying the [challenged] regulations have been made and articulated by the Legislature" (*Bourquin v Cuomo*, 85 NY2d 781, 785 [1995], quoting *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340, 348 [1991]).

Therefore, it is clear that the Board of Health wrote the Portion Cap Rule without benefit of legislative guidance, and did not simply fill in details guided by independent legislation. Because there was no legislative articulation of health policy goals associated with consumption of sugary beverages upon which to ground the Portion Cap Rule, the application of the second *Boreali* factor generates the same conclusion as the first factor: the adoption of the rule involved the choosing of ends, or policymaking.

## VII.

With regard to the third *Boreali* factor, little needs to be added to the Appellate Division's analysis. We again caution, however, that the *Boreali* factors do not constitute rigid conditions, all of which must be met in order for petitioners to prevail. Here, inaction on the part of the state legislature and City Council, in the face of plentiful opportunity to act if so desired, simply constitutes additional evidence that the Board's adoption of the Portion Cap Rule amounted to making new policy, rather than carrying out preexisting legislative policy.

In light of *Boreali*'s central theme that an administrative agency exceeds its authority when it makes difficult choices between public policy ends, rather than finds means to an end chosen by the legislature, we need not, in this appeal, address

the fourth *Boreali* factor: whether special expertise or technical competence was involved in the development of the rule. We do not mean to imply that the fourth factor will always lack significance. A court might be alerted to the broad, policy-making intent of a regulation, and the absence of any perceived need for agency expertise, by the fact that the rule was adopted with very little technical discussion. Here, regardless of who or which arm of government first proposed or drafted the Portion Cap Rule, and regardless of whether the Board exercised its considerable professional expertise or merely rubber-stamped a rule drafted outside the agency, the Portion Cap Rule is invalid under *Boreali*.

## VIII.

In sum, the New York City Board of Health exceeded the scope of its regulatory authority by adopting the Portion Cap Rule. Supreme Court properly declared the rule invalid and enjoined its implementation.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

ABDUS-SALAAM, J. (concurring). The majority appropriately employs a flexible case-specific analysis of the New York City Board of Health's authority and correctly concludes that when the Board issued the peculiar "Sugary Drinks Portion Cap Rule," it exercised a power which no legislative body has delegated to it (*see generally* majority op at 690, 696-701). Because I agree with the core rationale and result of the majority's opinion, I join that opinion in full. I write separately to emphasize the carefully circumscribed nature of the Court's decision.

Importantly, in concluding that the Board exceeded the bounds of its health-related regulatory authority, the majority does not give dispositive effect to any single aspect of the Board's conduct (*see* majority op at 696-697). As I see it, the majority determines that the Board improperly engaged in law-making based on the unique combination of the following characteristics of the portion cap rule: (1) the rule sets a broadly applicable policy affecting a large portion of the jurisdiction's (New York City's) population; (2) the rule involves a value judgment about voluntary consumer behavior; (3) the rule addresses a field of potential regulation that relevant legislative bodies have considered but not acted upon; and (4) the rule does not respond to a clearly identified, widespread health crisis which

has a simple, well-understood and agreed-upon cause, such as an infectious disease. In finding that these factors render the portion cap rule an impermissible political and legislative enactment, I do not understand the majority to establish any rigid decisional framework to be applied mechanically to other actions undertaken by the Board or separate administrative agencies in the future.

Contrary to the dissent's assertions (*see* dissenting op at 702, 707-714), our decision does not signal any significant departure from existing precedent regarding administrative law in general or the scope of the Board's authority in particular. As my colleagues in the majority and I explain (*see* majority op at 694-696), we have no quarrel with much of the dissent's historical analysis of the Board's authority or past decisions which have taken an expansive view of that authority in particular contexts. Indeed, no one should read today's decision too broadly. We simply conclude that, under the circumstances of this case, the Board ran afoul of separation of powers principles by creating the portion cap rule.

READ, J. (dissenting). In *Boreali v Axelrod* (71 NY2d 1 [1987]), we invalidated a regulation on indoor smoking promulgated by a state health agency on the ground that it was an exercise of legislative rather than regulatory authority, and was therefore a violation of the separation-of-powers doctrine. Today the Court again declares that a controversial regulation runs afoul of separation of powers. In so doing, the majority misapprehends, mischaracterizes and thereby curtails the powers of the New York City Board of Health to address the public health threats of the early 21st century. Neither *Boreali* nor any other doctrine in our jurisprudence compels this unhappy result. I respectfully dissent.

I.

During his third mayoral term, New York City Mayor Michael Bloomberg made the fight against obesity, especially among children, a top priority for his administration. The skills and powers of many New York City agencies were brought to bear, including the New York City Departments of Education, Transportation, Parks and City Planning. The most active agency, though, was the New York City Department of Health and Mental Hygiene (the Department), which initiated and

worked on a host of public health programs aimed at improving the nutrition and physical fitness of New York City residents (*see generally Reversing the Epidemic: New York City Obesity Task Force Plan to Prevent and Control Obesity* [May 2012]).

In June 2012, the Department proposed a rule to the New York City Board of Health (hereafter, generally referred to as the Board) for inclusion in New York City's Health Code. That rule, which the Board calls "the Portion Cap Rule" and petitioners, "the Soda Ban" (hereafter, generally referred to as the Rule), set a ceiling on the serving size of certain kinds of sugary drinks in food service establishments historically regulated by the Department (*see* NY City Health Code [24 RCNY] § 81.53). Other kinds of drinks and establishments were excepted from the regulation's coverage (*see id.*).

In July 2012, the Board held a public hearing on the proposed rule and received voluminous public comments. After considering these comments, the Board voted unanimously to approve the Rule as proposed by the Department, and it was added to the Health Code in September 2012. Petitioners' lawsuit followed one month later. They argued that the Board had acted beyond its delegated power in adopting the Rule, and asked the court to restrain the Board from enforcing the Rule on the ground it was ultra vires; to declare that the delegation of power to the Board in the New York City Charter (the City Charter) violated article IX, § 1 (a) of the New York State Constitution, which provides that every local government "shall have a legislative body elective by the people thereof," to the extent that the City Charter authorized the Board to adopt the Rule; or to restrain the Board on the basis it had acted arbitrarily and capriciously in adopting the Rule.

As an initial matter, correct resolution of this appeal depends upon an accurate understanding of the source and extent of the Board's authority. Petitioners take the position that the Board's power is delegated by the New York City Council (the Council) under the City Charter. Similarly, Supreme Court examined the City Charter's history to conclude that the Board has always been a city administrative body, chiefly concerned with infectious disease and harmful substances. The Appellate Division appears to have accepted this conclusion, chiding the Board for not declaring sugary drinks "inherently unhealthy" before regulating them (110 AD3d 1, 11 [2013]). And now the majority chimes in that the Board derives its authority "like that of any other administrative agency" from the City Charter, and faults

the Board for presuming to analogize its unique powers to those of a legislative body (*see* majority op at 695).

But the history of the City's approaches to the challenges of public health supports the Board's portrayal of its authority. As the Board points out, whether those powers are *"characterized as legislative or regulatory in nature"* is somewhat beside the point because, in either event, its "authority is broad, and its special structure allows serious issues of public health to be addressed" expeditiously (emphasis added). As discussed in detail in this opinion, the Board's powers to enact substantive rules and standards in the area of public health derive from state—not local—law. Thus, the Board is not required to stay its hand absent authorization from the Council to regulate sugary drinks. The only question on this appeal *should* be whether the Board, in adopting the Rule, acted reasonably within the bounds of its state-delegated powers.

## II.

### Historical Overview

The earliest public health regulations in New York City (the City) focused on the quarantine and inspection of ships attempting to call at the harbor. State statutes provided for this process in some detail, and empowered the governor or the mayor to give the green light to waiting vessels (*see e.g.* L 1784, ch 57; L 1794, ch 53). In 1796, the New York State Legislature shifted these powers to an appointed "health officer" and appointed "health commissioners," and also directed physicians to begin reporting cases of infectious disease to these officials (*see* L 1796, ch 38). The legislature also provided that the mayor and the common council could make "bye-laws" for clearing and filling streets or lots, and for removing noxious or dangerous industries or businesses to protect the public health (*see id.*). In short order the power to make these "bye-laws" was moved by state statute to the appointed health officials (*see* L 1798, ch 65).

The term "board of health" first appears in state statutes in 1811 (*see* L 1811, ch 175). Throughout the first half of the 19th century, the New York State Legislature passed detailed laws expanding the procedures and powers of this predecessor of the modern-day Board, including the regulation of certain products within city limits, such as animal hides and cotton (*see e.g.* L 1820, ch 229; L 1823, ch 71, § 39). In addition to specific directives, the

legislature also included broad grants of power to regulate public health generally; for example, authorizing all existing boards of health "[t]o make regulations, in their discretion, concerning the place and mode of quarantine; . . . and all such other regulations as they shall think necessary and proper for the preservation of the public health" (L 1832, ch 333, § 5 [4]).

Then followed a brief period where public health regulation was entrusted to elected officials. In 1850, the legislature directed that the Board would consist not of appointees, but of the mayor and the members of the common council, who would sit as the Board and would assume all responsibilities previously entrusted to that body (*see* L 1850, ch 275). This experiment was short-lived: the legislature returned the Board's composition to a group of appointed experts in 1866, this time to sit as the head of the newly-minted Metropolitan Sanitation District, which included the counties of New York, Kings, Westchester, and Richmond.

The enabling statute's text leaves no doubt about the separate authority vested in the Board, stating that

> "said board shall also possess . . . throughout said district, all the power and authority for the protection of life or health, or the care or preservation of health, or persons diseased or threatened therewith, conferred by any law or ordinance . . . upon the Mayor, Common Council, Board of Health, or the Health Officers . . . All the aforesaid powers are to be possessed and exercised as fully as if herein repeated and separately conferred upon said Board"
> (L 1866, ch 74, § 12).

The statute also explicitly empowered the Board to "enact such by-laws, rules and regulations as it may deem advisable, in harmony with the provisions and purposes of this act" (L 1866, ch 74, § 20). Although the Metropolitan Sanitation District itself was also short-lived—and ahead of its time—the fundamental structure established by the 1866 statutes has largely endured.

In 1870, the District was disbanded and its powers (at least in the City) were transferred wholesale to the new Department of Health, with, again, the Board at its core (*see* L 1870, ch 137, § 90; L 1870, ch 383, § 26). In 1873, the "by-laws, rules and regulations" mentioned in 1866 were given a formal title, the "Sanitary Code," and the Board was, again, vested by the state legislature with the sole power to amend and modify these rules

(*see* L 1873, ch 335, § 82). Throughout the remaining decades of the 19th century, the legislature repeatedly expanded and re-affirmed the Board's powers and independence in the City (*see e.g.* L 1883, ch 430; L 1882, ch 410, § 278; L 1874, ch 636).

Consistent with the state legislature's actions, we took an expansive view of the Board's powers throughout this period. In *Metropolitan Bd. of Health v Heister* (37 NY 661 [1868]), we heard four consolidated cases in which the defendants argued that the Board was without power to pass ordinances regulating the driving and slaughtering of cattle within city limits, or to hold summary adjudications penalizing violations of these rules (*id.* at 665). The legislature had given no direction to the Board concerning livestock regulations in the 1866 statute, although it had supplied extensive instructions on other matters. Neverthe-less, after an examination of statutory history, we concluded that

> "[t]hese acts show that, from the earliest organiza-tion of the government, the absolute control over persons and property, so far as the public health was concerned, was vested in boards or officers, who exercised a summary jurisdiction over the subject, and who were not bound to wait the slow course of the law, and that juries had never been used in this class of cases. The governor, the mayor, health offi-cers under various names, were the persons in-trusted with the execution of this important public function; and they were always empowered to act in a summary manner" (*Heister* at 670; *see also Polin-sky v People*, 73 NY 65, 69-70 [1878] ["That the Legislature in the exercise of its constitutional authority may lawfully confer on boards of health the power to enact sanitary ordinances, having the force of law within the districts over which their ju-risdiction extends, is not an open question. This power has been repeatedly recognized and af-firmed"]).

The consolidation of various municipalities into the New York City we know today began in 1897 with passage of the first Greater New York City Charter (*see* L 1897, ch 378). That charter established a statutory framework for the Board that is notably similar to both the reforms of 1866 and the current City Charter. It provided for a department of health, with a board of appointed officers as its head (*see* 1897 City Charter § 1167); it

then specified the powers and duties of each, first in broad terms, stating as follows:

> "All the authority, duty and powers heretofore conferred or enjoined upon the health departments, boards of health, health and sanitary officers . . . in any of the territory now within or hereafter to become a part of The City of New York . . . are hereby conferred upon and vested in and enjoined upon, and shall hereafter be exclusively exercised in The City of New York by the department of health, and board of health, created by this act" (1897 City Charter § 1168).[1]

As the preceding discussion demonstrates, by the dawn of the 20th century, the legislature and the courts had long understood that these consolidated powers were broad in scope, and—importantly for this appeal—that the Board could act *independently* within its mandate from the legislature. Further reinforcing this interpretation is the language enabling the Board to create, amend and enforce the Sanitary Code; specifically,

> "[s]aid board of health is hereby authorized and empowered, from time to time, to add to or to alter, amend or annul any part of the said sanitary code . . . The board of health may embrace therein all matters and subjects to which, and so far as, the power and authority of said department of health extends, not limiting their application to the subject of health only" (1897 City Charter § 1172).

This language continued through decades of consolidations and amendments of the City Charter, renaming of departments and renumbering of charter provisions (*see e.g.* 1901 City Charter §§ 1168, 1172; 1938 City Charter §§ 556, 558 [b], [c], [f]; 1961 City Charter §§ 556, 558 [b], [c], [f]).

Our interpretation of these provisions remained constant. We repeatedly affirmed the broad nature of the powers vested in and duties conferred upon the Board by the New York State Legislature (*see e.g. People v Blanchard*, 288 NY 145, 147 [1942] [The Sanitary Code (now the Health Code) may, therefore, "be taken to be a body of administrative provisions sanctioned by a

---

**1.** As a point of comparison, note the language empowering the Commissioner of Health in the City of Brooklyn's 1888 Charter: "Said health commissioner shall have power to act in a legislative capacity in regard to all matters pertaining to public health" (L 1888, ch 583, tit XII, § 2).

time-honored exception to the principle that there is to be no transfer of the authority of the Legislature"]; *Matter of Bakers Mut. Ins. Co. of N.Y. [Department of Health of City of N.Y.]*, 301 NY 21, 27 [1950] [the legislature has specified that "(t)he Sanitary Code of the City of New York (now the Health Code) is to have within that city the force and effect of State law"]; *Matter of Schulman v New York City Health & Hosps. Corp.*, 38 NY2d 234, 237 n 1 [1975] ["(T)he Board of Health has been *recognized by the Legislature as the sole legislative authority in the field of health regulation in the City of New York*" (emphasis added)]). As the Board points out in its briefing here, we have often characterized its powers as "legislative" (*see e.g. Grossman v Baumgartner*, 17 NY2d 345, 351 [1966] ["The deduction is clear from section 558 of the City Charter—which empowers the Board of Health to legislate in the field of health generally, including the control of communicable diseases . . . that *the Legislature intended the Board of Health to be the sole legislative authority within the City of New York in the field of health regulations* as long as those regulations were not inconsistent with or contrary to *State laws dealing with the same subject matter*" (emphases added)]), and "well-nigh plenary" (*see People ex rel. Knoblauch v Warden*, 216 NY 154, 162 [1915]; *see also Paduano v City of New York*, 45 Misc 2d 718, 721 [Sup Ct, NY County 1965], *affd on op below* 24 AD2d 437 [1st Dept 1965], *affd* 17 NY2d 875 [1966], *cert denied* 385 US 1026 [1967] [lower court cited to and quoted from the Report of the 1936 New York City Charter Revision Commission (at 38), which stated that "(b)y its power to adopt a sanitary code *the Board has plenary powers of legislation*" (emphasis added)]).

### Petitioners' Contentions

This review of statutes and cases puts paid to petitioners' key contentions. First, Supreme Court's interpretation of the Board's power was much too narrow. It is true that the statutes empowering the Board have listed specific areas of responsibility, particularly with regard to communicable diseases, as they do today. But the most historically consistent reading of this fact is that the legislature has entrusted the Board to act with a great deal of discretion, while also ensuring that it will address specified areas of concern, and has provided procedures for doing so. That the residents of New York City no longer count typhoid and dysentery among their chief health concerns is a sign that those scourges have been conquered, not a ground for

preventing the Board from turning its attention to contemporary public health threats.

Second, petitioners insist that the expansive language that our opinions have used to describe the Board's power was "stray" or "imprecise"; the majority dismisses our depiction of the Board's powers in *Grossman* and *Schulman* as mere "passing references" (majority op at 695). But it is impossible to wish away the large body of case law in which we have repeatedly described the source of the Board's delegated authority (the New York State Legislature) and its extent (as broad as it needs to be to protect public health). While it may sound odd in the context of modern-day administrative law to call an agency's authority "legislative," the Board's authority is quite clearly at least "nearly legislative." Our many statements to this effect simply recognized what the state legislature has expressed through nearly two centuries of consistent statutes.

Turning to more recent history, petitioners argue that the significant amendments to the home rule regime enacted in 1964 have somehow altered the Board's fundamental authority. In particular, they point out that under these statutes, local legislatures can pass laws relating to the "safety, health and well-being of persons" within their jurisdiction (*see* Municipal Home Rule Law § 10 [1] [ii] [a] [12]), and that this local power is not explicitly restricted (*see* Municipal Home Rule Law § 11 [preempting local laws relating to certain topics such as education and labor]). But the Municipal Home Rule Law's savings clauses explicitly preserve the power of any existing "board, body or officer," and continue the force and effectiveness of any existing laws "until lawfully repealed, amended, modified or superseded" (Municipal Home Rule Law §§ 50 [3]; 56 [1]).

Finally, petitioners contend that reforms to the Charter in 1989 stripped the Board of independent authority, even in its traditional realm; the majority seems to agree (*see* majority op at 694 n 1). The 1989 revisions to the Charter eliminated the former Board of Estimate from city governance and established the City Administrative Procedure Act. Petitioners theorize that because these revisions put such emphasis on the principle that the Council is the City's sole legislative authority, the Board perforce operates under a delegation from the Council. This, of course, is an argument by implication, as it does not—because it cannot—rely on any express statement of law.

The 1989 revisions were concerned with the particular problems presented by the former Board of Estimate, and a lack

of minority representation in the Council (*see* Final Rep of NY City Charter Revision Commn, Jan. 1989—Nov. 1989 at 1 [1990] [hereinafter Revision Report]). The Board of Estimate was a body composed of the mayor, the city comptroller, the council president and the five borough presidents, and had been a part of city governance since at least the turn of the century (*see* 1897 City Charter § 226). By 1989 the Board of Estimate was responsible for the budget, land use, franchising and city agency contracting, giving it extensive power, particularly at the expense of the Council (Revision Report at 7). This was especially vexing for the City's substantial minority populations, which struggled to send representatives to the top positions that made up this powerful body (*see id.* at 8). In 1981, residents and voters in Brooklyn brought a lawsuit challenging the Board of Estimate as unconstitutional. They were ultimately successful in the United States Supreme Court, which struck down the charter provision constituting the Board of Estimate as a violation of the Fourteenth Amendment (*see Board of Estimate of City of New York v Morris*, 489 US 688, 690 [1989]).

Accordingly, the Charter Revision Commission focused its attention on whether to retain the Board of Estimate, and how to increase representation in city government. In the end, it recommended the dissolution of the Board of Estimate, an increase in Council districts from 35 to 51, and a reapportionment of the various powers the former body had once wielded (*see generally* Revision Report). Nowhere in this report, or in any of the amendments to the Charter approved by voter referendum in 1988, is there any reference to the Board or the Department. No doubt it is true, as petitioners and their supporting amici curiae assert, that the 1989 revisions wrought important changes in city governance. But in light of the Board's very clear history, it cannot be true that unrelated reforms to the Charter silently switched the Board's source of delegated powers from the state legislature to the Council.

In sum, review of the Board's history can lead to only one conclusion: its authority to regulate the public health in the City is delegated by the New York State Legislature, and its regulations have the force and effect of state law. The delegation granted by the state is and always has been very broad. Of course, nothing prevents the Council from passing public health legislation if it sees fit to do so. But in light of the Board's independent authority, delegated to it by the legislature, it is of no legal consequence that the Council has not affirmatively authorized Rule 81.53, or the regulation of sugary drinks in general.

And until controversy erupted over the Rule, the Board's independent authority in the sphere of public health was well understood. For example, on December 5, 2006 the Board adopted a rule banning the use of all but tiny amounts of artificial trans fat in restaurant cooking in the City, effective January 10, 2007 (*see* NY City Health Code [24 RCNY] § 81.08). The Council some months later adopted a local law, effective July 1, 2007, amending the City's Administrative Code to add provisions consistent with the Board's trans fat rule (Administrative Code of City of NY § 17-192). In short, rule 81.08 was effective in January 2007, although the Council had not authorized the regulation of trans fats at the time.

The majority essentially argues that it cannot be true that the Board may act independently of the Council in the area of public health because, otherwise, what would happen if "the Board . . . pass[ed] a health 'law' that directly conflicted with a local law of the City Council"? (Majority op at 695.) The answer is simple: if a regulation promulgated by the Board in the Health Code conflicts in some direct way with a local law, the Board's action trumps the Council's.[2] While my colleagues in the majority may be troubled by this state of affairs, it is not their proper role to change it. The elected state legislature granted the Board the powers that it exercises. If the electorate of the City of New York desires to divest the Board of authority to act independently of the Council in matters of public health, the appropriate and democratic response is amendment of the City Charter.

## III.

### *Boreali*

Much of the debate in this case has focused on our decision in *Boreali*. This opinion is viewed as having an outsized impact on New York law, in no small part because it suggests that we are one of the few jurisdictions with a "strong" non-delegation doctrine, at least in the eyes of some commentators (*see e.g.* Borchers & Markell, New York State Administrative Procedure and Practice § 5.3 at 143-145 [2d ed 26 West's NY Prac Series 1998]; David Super, *Against Flexibility*, 96 Cornell L Rev 1375, 1387 n 32 [2011]; Gary Greco, *Standards or Safeguards: A Survey of*

---

**2.** The same would be true, of course, if a direct conflict existed between a local law in the area of public health and some action taken by the state legislature or the New York State Department of Health. Preemption is not a novel concept.

*the Delegation Doctrine in the States,* 8 Admin LJ Am U 567, 581 [1994]). Several academic amici curiae have urged the Court to disavow *Boreali,* arguing that it puts a stranglehold on reasonable agency rulemaking. This should not be necessary, although it is important to understand *Boreali* properly, and to avoid applying its reasoning too rigidly.

First, the lower courts and the parties have approached the four "coalescing circumstances" that persuaded us in *Boreali* that the State Public Health Council had gone too far as though they are four prongs of a hard-and-fast test. They have marched through these four *"Boreali* factors," run the facts of this appeal through each one, checked "pass" or "fail," and tabulated the total. This is not what the decision mandates. While we referred to these four factors in some later cases *(see Rent Stabilization Assn. of N.Y. City v Higgins,* 83 NY2d 156, 169-170 [1993]; *Matter of New York State Health Facilities Assn. v Axelrod,* 77 NY2d 340, 346 [1991]), we have never treated them as requirements, and, indeed, we have generally not addressed them *at all* in separation-of-powers analyses *(see e.g. Matter of Medical Socy. of State of N.Y. v Serio,* 100 NY2d 854, 864 [2003]; *Bourquin v Cuomo,* 85 NY2d 781, 787 [1995]; *Matter of Campagna v Shaffer,* 73 NY2d 237, 243 [1989]). And in those cases where we have discussed the four *Boreali* factors, we have not hesitated to set aside certain of them as irrelevant in the context of the delegation then under review *(see Rent Stabilization Assn.,* 83 NY2d at 170 [disregarding legislature's failure to act on a particular policy issue]; *Health Facilities Assn.,* 77 NY2d at 348 n 2 [same]).

The proper approach in any separation-of-powers analysis is therefore flexible and case-specific, addressing each agency or executive action in light of the relevant legislative delegation it invokes *(see Bourquin,* 85 NY2d at 784-785; *Clark v Cuomo,* 66 NY2d 185, 189 [1985]; *Matter of Levine v Whalen,* 39 NY2d 510, 515 [1976]). *Boreali* represents a situation where a particular agency had taken a particular action that, in view of its particular delegation, "usurped the Legislature's prerogative" *(Boreali,* 71 NY2d at 11).

That is not the case here. The legislature has directed the Board to oversee and protect the public health of the City of New York by enacting rules in the Health Code. Those rules extend to all responsibilities within the competence of the Department, including "the preservation of human life," "the care, promotion and protection of health," the "control of

communicable and chronic diseases and conditions hazardous to life and health," and "supervis[ion] and regulat[ion of] the food and drug supply of the city and other businesses and activities affecting public health in the city [to] ensure that such businesses and activities are conducted in a manner consistent with the public interest" (City Charter § 556 [a] [1]; [c] [2], [9]). This delegation is no less specific than the one we approved in *Matter of Levine v Whalen* (39 NY2d 510 [1976]), which permitted agency action under a statute whose declaration of purpose stated that

> "[i]n order to provide for the protection and promotion of the health of the inhabitants of the state, pursuant to section three of article seventeen of the constitution, the department of health shall have the central, comprehensive responsibility for the development and administration of the state's policy with respect to hospital and related services" (*id.* at 516).

Here, the Board identified a complicated threat to the health of city residents with many interrelated causes; i.e., obesity. As part of a wide-ranging effort to combat this threat, the Board focused on certain kinds of drinks sold in establishments over which the Department had sure jurisdiction. The Board considered several options for addressing the problem, and chose one after open public debate, calibrated to the severity of the threat and its most serious manifestations, and cognizant of the limits of its enforcement power and the feasibility of compliance. There can be little doubt that this was within the Board's statutory delegation.

Nor is there any legal problem with the method the Board has chosen to protect the health of city residents; i.e., a rule that seeks to influence consumer choices by making some choices marginally less convenient than others. The Appellate Division admonishes the Board for crafting this type of rule without an explicit directive to do so, and appears to conclude that the Board would have acted properly if only it had completely banned all sugary drinks within the City's borders. This is certainly not what *Boreali* commands, and neither is it good practice for administrative rulemaking. Safeguarding public health is a vast and complex responsibility, and any agency entrusted with this obligation must carefully consider what types of rules will best address its many disparate aspects.

## The Majority's *Boreali* Analysis

The majority's *Boreali* analysis raises two questions. First, having rejected the Board's argument that its authority and delegated powers are conferred by the state legislature, not the Council, why is *Boreali* even relevant? After all, the basis for the separation-of-powers approach enunciated in *Boreali* is article III, § 1 of the New York State Constitution, specifying that "[t]he legislative power of this state shall be vested in the senate and assembly" (*Boreali*, 71 NY2d at 9). Simply put, this constitutional provision, by its very terms, does not apply to local governments.

The majority cites *Under 21, Catholic Home Bur. for Dependent Children v City of New York* (65 NY2d 344 [1985]). In *Under 21*—a case decided three years *before Boreali*—we held that Mayor Koch lacked authority to issue an executive order proscribing discrimination by city contractors on a ground not covered by any legislative enactment of the Council. But we recognized in *Under 21* that "the pattern of government established for New York City by the City Charter is not identical to that of . . . the State of New York" (*id.* at 356); and, as illustrated earlier, this is certainly true: the Board's powers are delegated by the state legislature, not its local legislative body, the Council. To my knowledge, before today we have never applied the *Boreali* separation-of-powers doctrine outside the context of state legislative delegations to state agencies under the state constitution. By extending *Boreali* to local governments by virtue of article IX, § 1 (a) of the constitution, the majority takes a big step without pausing to consider the consequences.

Second, the majority seemingly advocates a flexible approach to the four "coalescing circumstances" set out in *Boreali* (majority op at 696-697), in particular, acknowledging that "*Boreali* should not be interpreted to prohibit an agency from attempting to balance costs and benefits" (*id.* at 697-698). But then the majority instructs that a *Boreali* analysis should focus on distinguishing between policy ends and regulatory means, claiming that

"[b]y restricting portions, the Board necessarily chose between ends, including public health, the economic consequences associated with restricting profits by beverage companies and vendors, tax implications for small business owners, and personal

autonomy with respect to the choices of New York City residents concerning what they consume. Most obviously, the Portion Cap Rule embodied a compromise that attempted to promote a healthy diet without significantly affecting the beverage industry. *This necessarily implied a relative valuing of health considerations and economic ends"* (*id.* at 698 [emphasis added]).

I agree that this sort of balancing "necessarily implie[s] a relative valuing of" or making trade-offs between health and economic and other considerations and impacts. But then, that is how an agency carries out a cost-benefit analysis when deciding if and what sort of regulatory action to take. And what is inherently wrong with a regulation that seeks to "promote a healthy diet without significantly affecting the beverage industry"? Aren't regulatory agencies *supposed* to take into account and reduce insofar as practicable any deleterious side effects of their rules on affected entities?[3]

There is no obvious reason why "economic consequences," "tax implications for small business owners" and "personal autonomy" are "ends." One could just as easily define the "ends" (as the Board did) to mean the protection of public health from risks associated with overconsumption of sugary drinks. Economic consequences, the effects on small business owners and personal autonomy are simply the kinds of factors the Board properly took into account when weighing the costs and benefits of different ways to achieve its public health "ends."

---

**3.** Cost-benefit analysis has long been a staple of state and federal regulatory processes (*see e.g.* State Administrative Procedure Act § 202-a [1] ["In developing a rule, an agency shall, to the extent consistent with the objectives of applicable statutes, *consider utilizing approaches which are designed to avoid undue deleterious economic effects or overly burdensome impacts of the rule upon persons"* (emphasis added)]; Executive Order [Obama] No. 13563 of 2011 § 1 [b] [76 Fed Reg 3821 (2011)] [instructing agencies to "propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs," "tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives," and "select, in choosing among alternative regulatory approaches, those approaches that maximize net benefits"]; Executive Order [Clinton] No. 12866 of 1993 § 1 [a], [b] [5] [58 Fed Reg 51735 (1993)] ["In deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives," and "design . . . regulations in the most cost-effective manner to achieve the regulatory objective"]).

In a similar vein, the majority goes on to add that

"[s]ignificantly, the Portion Cap Rule also evidenced a policy choice relating to the question of the extent to which government may legitimately influence citizens' decision-making. In deciding to use an indirect method—making it inconvenient, but not impossible, to purchase more than 16 fluid ounces of a sugary beverage while dining at a food service establishment—the [Board] rejected alternative approaches, ranging from instruction (i.e. health warnings on large containers or near vending machines) to outright prohibition. This preference for an indirect means of achieving compliance with goals of healthier intake of sugary beverages was itself a policy choice, relating to the degree of autonomy a government permits its citizens to exercise and the ways in which it might seek to modify their behavior indirectly" (*id.* at 698).

But why is an "indirect means" of achieving an end (healthier intake) a forbidden policy choice? Making the healthier choice the simpler choice is one way to reduce overconsumption of sugary drinks, a category of products that has repeatedly been linked to weight gain, obesity and a variety of diseases. And the Board chose this means over other possible approaches as a way to tailor its regulations so as to impose the least burden on society—i.e., as the result of run-of-the-mine cost-benefit analysis.

With all due respect to my colleagues, their proposed ends-means test is virtually inscrutable and surely unworkable. It harks back to long discredited formalistic approaches to administrative law, which were seemingly objective but instead served as camouflage for enforcement of judicial preferences. In this case, a majority of the Court just does not believe it to be a good idea for the Board to mandate the portion size of sugary drinks, apparently on the theory that the Council should be the sole arbiter of "the choices of New York City residents concerning what they consume" (majority op at 698), at least in those situations where the choices are not immediately life-threatening. I can appreciate this vison of the world as a philosophical matter, but I see no legal basis for it here.

## IV.

Because the Portion Cap Rule does not suffer from any non-delegation or separation-of-powers infirmity, the proper stan-

dard for our review is whether the regulation is "so lacking in reason for its promulgation that it is essentially arbitrary" (*see Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.*, 2 NY3d 249, 254 [2004], quoting *Matter of Bernstein v Toia*, 43 NY2d 437, 448 [1977]). The Rule easily passes this test.

Following the submission of public comments on Rule 81.53, the Department responded to the many concerns raised with a 13-page memorandum explaining in detail why sugary drinks were targeted, and why some drinks and establishments were excluded. The memorandum cites peer-reviewed academic research and the findings of other public health bodies. The Board debated the issues presented and responses, and placed its deliberations in the public record of its meetings. Dr. Thomas Farley, the Commissioner of the Department and a certified pediatrician with 30 years of clinical and research experience, has submitted in the record of this case an affidavit explaining in great detail the reasons for creating the Rule and for giving it the particular form that it has taken. Fourteen public health and medical associations have supplied amicus curiae briefs to this Court with further citations and arguments supporting the Board's proffered explanations.

Petitioners and their supporting amici curiae, as well as Supreme Court, have countered the extensive documentation supporting the Board's reasoning with arguments that the Rule is rife with loopholes and will never achieve its goal of reducing obesity. But a rule is not irrational because there are reasons to disagree with or ways to improve it, or because it does not completely solve the targeted problem (*see Matter of Unimax Corp. v Tax Appeals Trib. of State of N.Y.*, 79 NY2d 139, 144 [1992]). Given the exhaustive record in this case, it is clear that the Rule is not "lacking in reason for its promulgation." If it is ineffective, that will become clear enough in time, and the Board can correct course in light of new information. But this is no basis for the courts to strike the regulation down.

## V.

What petitioners have truly asked the courts to do is to strike down an *unpopular* regulation, not an illegal one. Indeed, petitioners constantly stress just *how* unpopular the Portion Cap Rule is. But if that is so, eliminating, limiting, or preventing it via political processes should present little obstacle.

Importantly, that is the appropriate way for expressing disagreement and seeking redress. *Boreali* should not be an escape hatch for those who are unhappy with a regulation, and are unable or unwilling to address it with available means.

To sum up, if the People of the City or State of New York are uncomfortable with the expansive powers first bestowed by the New York State Legislature on the New York City Board of Health over 150 years ago, they have every right and ability to call on their elected representatives to effect change. This Court, however, does not. And there is no question that the Portion Cap Rule falls comfortably within the broad delegation granted to the Board by the legislature. The majority fails to advance any persuasive argument why the judiciary should step into the middle of a debate over public health policy and prohibit the Board from implementing a measure designed to reduce chronic health risks associated with sugary beverages just because the Council has not chosen to act in this area.

Judges GRAFFEO, SMITH and ABDUS-SALAAM concur with Judge PIGOTT; Judge ABDUS-SALAAM in a concurring opinion; Judge READ dissents and votes to reverse in an opinion in which Chief Judge LIPPMAN concurs; Judge RIVERA taking no part.

Order affirmed, with costs.