Matter of Lawyers for Children v New York State Off. of Children & Family Servs. (2025 NY Slip Op 02115)

Matter of Lawyers for Children v New York State Off. of Children & Family Servs.

2025 NY Slip Op 02115

Decided on April 10, 2025

Appellate Division, Third Department

Garry, P.J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 10, 2025

CV-23-2341

[*1]In the Matter of Lawyers for Children et al., Appellants,
v
New York State Office of Children and Family Services et al., Respondents.

Calendar Date:January 6, 2025

Before: Garry, P.J., Pritzker, Ceresia, Powers and Mackey, JJ.

Proskauer Rose LLP, New York City (William C. Silverman of counsel), for appellants.
Letitia James, Attorney General, Albany (Beezly J. Kiernan of counsel), for respondents.
Morrison & Foerster LLP, New York City (Eric D. Lawson of counsel), for Merril Sobie, amicus curiae.

Garry, P.J.
Appeal from a judgment of the Supreme Court (Richard McNally Jr., J.), entered December 6, 2023 in Rensselaer County, which dismissed petitioners' application, in a proceeding pursuant to CPLR article 78, to review certain regulations enacted by respondent Office of Children and Family Services.
This matter, concerning certain regulations enacted by respondent Office of Children and Family Services (hereinafter OCFS), returns to us for a second time (218 AD3d 913 [3d Dept 2023]). The subject regulations established the Host Family Home program (see 18 NYCRR 444.1), which aims to provide "supportive services . . . to children and their families . . . for the purpose of: assisting a family in need of day-to-day community-based supports by peers, arranging for parents and children to be temporarily cared for together in a host family home, and/or temporarily supporting a family when a parent has determined that he/she is temporarily unable to care for their child . . . as a way to avert the need for more formal child welfare intervention" (18 NYCRR 444.2 [f]). Pursuant to the program, OCFS would designate qualified entities as "host family home agenc[ies]" (18 NYCRR 444.2 [c]; see 18 NYCRR 444.12), and, as "authorized agenc[ies]" (18 NYCRR 444.2 [c]), those agencies would, in turn, recruit, vet, train and supervise volunteer host families willing to provide such support to families in need (see 18 NYCRR 444.9-444.17). A parent would then be able to choose from among volunteers to select a family that best meets their present needs (see 18 NYCRR 444.4). When it is temporary care of a child that is needed, legal custody would not be relinquished; instead, the parent would execute "a designation of 'person in parental relation,' " in accordance with the General Obligations Law, for the intended duration of the care (18 NYCRR 444.5 [b]), which could be revoked at any time (see 18 NYCRR 444.5 [h] [5]; see also General Obligations Law art 5, title 15-A).
Petitioners, legal organizations with contracts to represent children in foster care proceedings, commenced this CPLR article 78 proceeding seeking to annul the regulations in their entirety. In petitioners' view, the Host Family Home program is a shadow voluntary foster care system without the procedural safeguards prescribed by the Legislature for such voluntary commitments. It is therefore argued that OCFS acted without legislative authority in creating the program and that the regulations are in conflict with the existing statutory scheme. Supreme Court disagreed and dismissed the petition. Petitioners appeal.[FN1]
Petitioners' argument that OCFS exceeded its authority when it created the Host Family Home program is unpersuasive. "Administrative agencies have all the powers expressly delegated to them by the Legislature, and are permitted to adopt regulations that go beyond the text of their enabling legislation, so long as those regulations are consistent with the statutory language and underlying purpose[*2]" (Matter of Juarez v New York State Off. of Victim Servs., 36 NY3d 485, 491-492 [2021] [internal quotation marks, brackets and citations omitted]; see State Div. of Human Rights v Genesee Hosp., 50 NY2d 113, 118 [1980]). "While an administrative agency may not, in the exercise of rule-making authority, engage in broad-based public policy determinations, the cornerstone of administrative law is the principle that the Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation" (Matter of Juarez v New York State Off. of Victim Servs., 36 NY3d at 492 [internal quotation marks, brackets and citations omitted]; see Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation, 71 NY2d 186, 191 [1988]).
We begin by briefly observing that the challenged program was inspired by a "preventive model," which, according to the record before us, appears to have been implemented in some form in at least 38 states.[FN2] That model was created by a nonprofit organization, Safe Families for Children, to assist families in need of support, including temporary care for their children, but lacking extended familial or community connections. According to Safe Families, the most common reasons why families use programs based on their model — either as a unit or for placement of a child/children only — include homelessness, hospitalizations, lack of family support, parental crisis and respite. Less common reasons include mental health issues, incarceration and unemployment. The model is fashioned as supplementary rather than substitute care, and the record reveals that, under Safe Families programs, a child's average length of stay with a "host family" was 22 days, compared to a national average of 13½ months for a child placed in foster care.
Against that backdrop, we examine the General Obligations Law title invoked by the regulations. As relevant here, General Obligations Law title 15-A empowers a parent of a minor to "designate another person as a person in parental relation to such minor" for the purpose of making certain healthcare and educational decisions for the child (General Obligations Law § 5-1551).[FN3] Such designation is presently permitted up to 12 months and grants the designee all the powers and duties set forth in the Public Health Law provisions governing (1) immunization requirements for a child's enrollment in school and (2) consent to certain medical, dental, health and hospital services and the provisions of the Education Law relating to duties regarding compulsory education, unless otherwise specified in the designation (see General Obligations Law § 5-1555 [1]; see also General Obligations Law § 5-1553).[FN4] Because the execution of a designation under title 15-A does not transfer legal custody of the subject child to the designee, any authorized decision [*3]of a designee is superseded by a contravening decision of a parent (see General Obligations Law § 5-1555 [5]) and the designation may be revoked by the parent at any time (see General Obligations Law § 5-1554).
The plain language of General Obligations Law title 15-A does not limit who may be designated a person in parental relation. We therefore need not consider the legislative history of the title to reject petitioners' claim that such a designation was only intended to be used for relatives (see Matter of Avella v City of New York, 29 NY3d 425, 437 [2017]). Nonetheless, it bears noting that nothing in that history evinces such an intent. In 2004, the Legislature enacted General Obligations Law former title 18, empowering a parent to authorize "an adult person in whose care a minor has been entrusted" or "caregiver" to make certain healthcare and educational decisions for that minor (L 2004, ch 749, § 1). That enactment was in acknowledgment that there had been a dramatic increase in the number of "grandparents and other non-parent caregivers" in recent years and that it could be difficult for "grandparents or other caregivers, who do not have legal custody of the children in their care, to sign relevant consent forms for educational or health care services" (Senate Introducer's Mem in Support, Bill Jacket, L 2004, ch 749 at 4).[FN5] A 2005 chapter amendment repealed that title to address a number of issues not relevant here and replaced it with title 15-A (see L 2005, ch 119, §§ 1, 2). The 2005 legislation similarly contemplated a designation of person in parental relation being utilized for "grandparents and other non-parent caregivers" (Senate Introducer's Mem in Support, Bill Jacket, L 2005, ch 119 at 3). Indeed, when General Obligations Law § 5-1551 was amended in 2018 to increase the maximum period of a designation from 6 to 12 months, several of the petitioners presently before us recognized that the designation could be used for both relatives and nonrelatives alike (see Letter from NYS Kinship Navigator et al., June 27, 2018 at 1, Bill Jacket, L 2018, ch 80 at 11).[FN6]
With that preexisting statutory mechanism in mind, we turn to the question of OCFS's authority. OCFS is the agency responsible for administering the child welfare laws of this state (see L 1997, ch 436, part B, § 122 [d]; see also Social Services Law §§ 17, 20, 34). To that end, it has been delegated broad authority "to establish rules, regulations and policies to carry out its powers and duties" under the Social Services Law (Social Services Law § 20 [3] [d]). One such duty is the care and protection of children, a matter governed by Social Services Law article 6, title 1. That title grants OCFS the authority to designate "[a]uthorized agenc[ies]" that are in turn empowered "to care for, to place out or to board out children" (Social Services Law § 371 [10] [a]; see Social Services Law §§ 374 [1]; 460-a [2]). The Legislature has defined to "[p]lace out" as "to arrange for the [*4]free care of a child in a family other than that of the child's parent, step-parent, grandparent, brother, sister, uncle, or aunt or legal guardian, for the purpose of adoption or for the purpose of providing care" (Social Services Law § 371 [12]), and to " '[b]oard out' means to arrange for the care of a child in a family, other than that of the child's parent, step-parent or legal guardian, to whom payment is made or agreed to be made for care and maintenance" (Social Services Law § 371 [14]). Section 374 of that title expressly provides that nothing therein shall restrict or limit the right of a parent to place out or board out their own child (see Social Services Law § 374 [2]), and there is similarly no limitation upon a parent's use of General Obligations Law title 15-A when they do so.
OCFS also has the authority to provide preventive services for children and their families (see L 1997, ch 436, part B, § 122 [d]; Social Services Law art 6, title 4) and to promulgate regulations concerning same, including "specification of services to be classified as preventive services; appropriate circumstances and conditions for the provision of particular services; appropriate providers and recipients of such services; and time limits, as may be appropriate, for the provision of particular services" (Social Services Law § 409-a [5] [a]). OCFS is also tasked with "promulgat[ing] regulations to prevent social services districts from overutilizing particular forms or types of preventive services and to encourage districts to provide balanced preventive services programs based on the identified needs of children and families residing in such districts" (Social Services Law § 409-a [5] [a]). The Legislature has defined preventive services, in pertinent part, as "supportive and rehabilitative services provided . . . to children and their families for the purpose of: averting an impairment or disruption of a family which will or could result in the placement of a child in foster care" (Social Services Law § 409). Although there are a number of circumstances when such services are legislatively mandated, the provision of preventive services to a child and his or her family is also generally authorized whenever OCFS believes that such services will avoid foster care placement (see Social Services Law § 409-a [2]).
Initially, it must be noted that the Host Family Home program is broader than petitioners' challenge to it. The program involves the provision of short-term care to children when that child's parent has determined that he or she is temporarily unable to provide such care, but it is also designed to provide care to children and parents together and to connect families with supportive individuals in their communities more generally (see 18 NYCRR 444.2 [f]). Petitioners do not address or challenge these significant aspects of the program. As for the short-term care of children, OCFS has been expressly delegated the authority to decide the appropriate circumstances [*5]for preventive services. In our view, the creation of a safe and reliable pool of volunteers for parents otherwise lacking "a village" of their own falls within the definition of such service (see Social Services Law § 409). As explained by OCFS in opposition to this petition, the hope is that, without the fear of unnecessary child welfare entanglement and the relinquishment of both care and custody of their child, as would be required with a voluntary foster care placement (sees26 Social Services Law § 384-a), parents will take advantage of available support, which, in turn, may help to avoid circumstances that could result in foster care placements and the prolonged separation of the family. We further find that implementation of that preventive service through the utilization of authorized agencies — that may arrange for the care of children with a family not their own — also falls within OCFS's authority (see Social Services Law § 371 [10] [a]; [12]). That said, the fact that OCFS is marshalling resources for parents does not change the fact that, under the Host Family Home program, it is ultimately the parent who is deciding whether and with whom to place their child (see 18 NYCRR 444.4) and, further, what the terms and length of that placement will be (see 18 NYCRR 444.5; see also General Obligations Law §§ 1-1553, 1-1555 [1]; Social Services Law § 372 [2]). This distinction, rejected by our dissenting colleagues, is critical to our consideration of petitioners' arguments regarding the alleged lack of protections for children and families under the program.
Petitioners argue that, notwithstanding the foregoing law, the Host Family Home regulations strip families of rights granted to them by the Legislature relating to voluntary foster care placements and, thus, are out of harmony with existing law regarding placements "outside of the home." Petitioners point to the requirements of preventive services prior to placement (see Social Services Law §§ 398 [1] [a]; 409-a [1] [a] [i]), prioritization of kin resources and placing siblings together (see Social Services Law § 384-a [1-a], [1-b]), various judicial oversight (see Social Services Law § 358-a [1], [2] [c] [iv], [vii]; see also Family Ct Act § 1089 [d] [2] [iii], [iv]), independent legal counsel, including for children (see Social Services Law § 358-a [6]; see also Family Ct Act §§ 249 [a]; 262 [a]; 1090 [a], [b]), diligent efforts by the state toward the child's discharge from care (see Social Services Law § 358-a [3] [e]; see also Family Ct Act § 1089 [d] [2] [iii]) and limitations on out-of-state placements (see Social Services Law § 374-a). To the extent that these safeguards are in fact absent from the Host Family Home program, their absence is in alignment with (1) the program's intended lack of involvement of the child welfare and court systems, in order to encourage parents to utilize the resource; and (2) the lack of governmental intrusion when fit parents provide for the care of [*6]their children (see generally Troxel v Granville, 530 US 57, 65-66 [2000]; Matter of Bennett v Jeffreys, 40 NY2d 543, 545-546 [1976]).
It is important to note, however, that the Host Family Home program is not without its own protections, and there are many. The regulations require procedures ensuring that parents are informed of their legal rights and not acting as a result of coercion (see 18 NYCRR 444.11). This includes the provision of information and referral services designed to address the needs of the family, both before a parent elects to participate in the program and continuing after execution of a designation (see 18 NYCRR 444.4 [e]), as well as their right to consult with an attorney and available free or low-cost legal services for the parent and child (see 18 NYCRR 444.5 [e]-[f]). Authorized agencies must also make diligent efforts to notify any parent with legal custody prior to the execution of designation of person in parental relation (see 18 NYCRR 444.4 [f]). Local care is to be prioritized (see 18 NYCRR 444.4 [a]-[c]), parents are permitted to formalize their expectations for continuing contact with the child (see 18 NYCRR 444.5 [h] [2]), and the short-term arrangement may be terminated at any time (see 18 NYCRR 444.5 [5]; 444.18 [a] [1]). Children 14 years old or older are provided the opportunity to be involved in making care arrangements (see 18 NYCRR 444.5 [j]). Host families must undergo, among other inquiry, formal background checks, home study and trainings (see{fs26 18 NYCRR 444.90, 444.15-444.16), and both the host family home agency and OCFS provide continuing oversight (see NYCRR 444.10, 444.17). Discriminatory treatment is prohibited (see 18 NYCRR 444.3), parameters on the discipline of children are prescribed (see 18 NYCRR 444.8), and staff of authorized agencies are mandated reporters (see 18 NYCRR 444.6 [b]). The regulations also set forth a comprehensive children's bill of rights (see 18 NYCRR 444.7) and corresponding expectations of host families (see 18 NYCRR 444.13), including consequences for failing to immediately honor the request of a parent to revoke the person in parental relation designation (see 18 NYCRR 444.18 [a]). Given that parents have always been permitted to place their children in the care of others, the challenged regulations result in increased protections for children, as well as their parents, under such circumstances.
Petitioners further assert that the regulations amount to legislative policymaking and thus violate the separation of powers doctrine. Boreali v Axelrod (71 NY2d 1 [1987]) continues to be the touchstone for "determining whether an agency has crossed the hazy 'line between administrative rule-making and legislative policy-making' " (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 610 [2015], quoting Boreali v Axelrod, 71 NY2d at 11; see Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, [*7]178 [2016]). The circumstances to be considered in differentiating between the two are "whether (1) the agency did more than balance costs and benefits according to preexisting guidelines, but instead made value judgments entailing difficult and complex choices between broad policy goals to resolve social problems; (2) the agency merely filled in details of a broad policy or if it wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance; (3) the [L]egislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve; and (4) the agency used special expertise or competence in the field to develop the challenged regulation" (Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d at 179-180 [internal quotation marks, brackets and citations omitted]; see Matter of Independent Ins. Agents & Brokers of N.Y., Inc. v New York State Dept. of Fin. Servs., 39 NY3d 56, 69-70 [2022]). These considerations "are not mandatory, need not be weighed evenly, and are essentially guidelines for conducting an analysis of an agency's exercise of power" (Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d at 180 [internal quotation marks and citation omitted]; see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d 681, 696-697 [2014]).
First, although the Host Family Home program relates to a multitude of difficult social problems that may cause a parent to be temporarily unable to care for their child, the Legislature, not OCFS, made the basic policy choice that is central to the program — avoiding placement of children in the foster care system in the first instance by proactively offering services to families (see Boreali v Axelrod, 71 NY2d at 11-12). In providing an additional form of support to parents "to avert the need for more formal child welfare intervention" (18 NYCRR 444.2 [f]), OCFS furthered that policy and did not make any sweeping value judgments of its own or otherwise transgress into the Legislature's role. Petitioners — and the dissent — view the central legislative policy at issue here as the need for robust protections for children residing outside their homes. However, we agree with respondents that the protections invoked by petitioners, discussed above, pertain to circumstances where the state has taken custody of a child and, thus, both parent and child have suffered the deprivation of a legal right, with court proceedings likely to ensue. We also reject the argument that the entire Host Family Home program is itself an impermissible "exception[ ]" to the voluntary foster care system (Boreali v Axelrod, 71 NY2d at 11-12). This is no truer for the subject program than any other preventive service aimed at avoiding foster care placement[*8]. There is also no record support for petitioners' claim that the program was merely a cost-savings measure.
Nor do we find that OCFS wrote on a clean slate in enacting the Host Family Home program (see Boreali v Axelrod, 71 NY2d at 13). Although, the program may indeed prove to be a "transform[ative]" service for families of this state, as noted by the dissent, OCFS has broken no new ground in its facilitation of such a preventive resource. Additionally, to the extent that the program involves short-term placements of children, it is largely a form of respite care — defined by the Legislature as "the temporary care and supervision of a child to relieve parents or other persons legally responsible for the care of such child where immediate relief is needed to maintain or restore family functioning" (Social Services Law § 409-a [5] [f]). As with preventive services generally, respite care is a matter that has long been entrusted to the discretion of OCFS (see Social Services Law § 409-a [5] [a]), and it is one on which OCFS has extensively regulated (see 18 NYCRR part 35). "Where an agency has promulgated regulations in a particular area for an extended time without any interference from the legislative body, we can infer, to some degree, that the [L]egislature approves of the agency's interpretation or action" (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d at 612 [citations omitted]).
We are also unpersuaded that the Legislature has unsuccessfully tried to reach agreement on the issue, so as to suggest that the matter is a topic within the legislative domain (see Boreali v Axelrod, 71 NY2d at 13). Petitioners point to a stalled proposal that would have allowed parents to make alternative living arrangements for children at substantial risk of abuse (see 2021-2022 NY Assembly Bill A8090, 2021-2022 NY Senate Bill S08148; see also 2023-2024 NY Assembly Bill A4383, 2023-2024 NY Senate Bill S5029). We first do not agree that this legislative effort concerns the same subject matter as the Host Family Home program as such circumstances of maltreatment would preclude a family's participation in the program (see 18 NYCRR 444.5 [c]). Moreover, the cited bill repeatedly died in committee, and "legislative inaction, because of its inherent ambiguity, affords the most dubious foundation for drawing positive inferences" (Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d 601, 615 [n 2018] [internal question marks, brackets and citations omitted]; see Matter of Vapor Tech. Assn. v Cuomo, 203 AD3d 1516, 1519 [3d Dept 2022], lv dismissed 39 NY3d 960 [2022]).
Finally, OCFS clearly utilized its expertise in crafting the Host Family Home program, and the fact that a model program was presented to it does not alter this conclusion (see Boreali v Axelrod, 71 NY2d at 13-14). The record establishes that, apart from drawing upon its understanding of this state's child welfare system, OCFS reviewed data suggesting that preventive [*9]programs led to a reduced number of children removed from their homes, fewer child protective service contacts, and reduced foster care entries. The record further reveals that OCFS consulted with child welfare agencies in various other states about those states' implementation of the model program. OCFS also meaningfully engaged in two notice and comment periods and made substantive revisions to the program in response thereto.
On balance, the Boreali factors lead us to the conclusion that the Host Family Home program regulations are a valid exercise of OCFS's rulemaking authority, bringing an end to our inquiry. We emphasize that "[o]ur role in this regard is not to question the efficacy or wisdom of the means chosen by the agency to accomplish the ends identified by the [L]egislature" (Matter of LeadingAge N.Y., Inc. v Shah, 32 NY3d 249, 261 [2018] [citation omitted]). As we have also found that the regulations are consistent with the governing statutory language and its purpose, we affirm.
Powers and Mackey, JJ., concur.
Pritzker, J. (dissenting).
As aptly noted by Supreme Court, the Host Family Home regulations (see 18 NYCRR 444.1 et seq.) establish a program which "allow[s] parents the option to circumvent foster care placement." Notably, before being sued for administrative overreach, respondent Office of Children and Family Services (hereinafter OCFS), who ostensibly runs the child welfare system, touted this program as a "bold, new initiative" that "will support New York's families without requiring the involvement of the child welfare system." However, whether to create a "bold, new" program that circumvents the current, statutorily created foster care system presents a question of public policy which is for our elected representatives to decide. Thus, it is our opinion that by choosing to promulgate these regulations instead of pursuing legislation, OCFS exceeded its authority by substituting its own policy preferences. To wit, the regulations not only "circumvent foster care placement," but directly conflict with and are anathema to the many hard-fought and critical due process safeguards specifically designed by the Legislature to protect the rights of children and their families. In our view, this eschewing of legislative intent is the hallmark of unbridled agency action and the ultra vires nature of the Host Family Home regulations is unmistakable. As such, we respectfully dissent.
To understand how far these regulations deviate from current policy, a brief overview of the historical evolution of the foster care system in New York is necessary. In 1884, the Legislature abolished both the ancient system of housing needy, neglected and abandoned children in poor houses and the practice of contracting placed children to private employers for reimbursement (see L 1884, ch 438, ch 470). Although this reform unquestionably benefited children, an unfortunate and unintended consequence was that counties, unable to rely upon child labor [*10]to defray associated costs, sought to place children, often informally, "in any home obtainable, where it will cease to be a county charge" (David M. Schneider & Albert Deutsch, The History of Public Welfare in New York State: 1867-1940, 57 Political Science Quarterly 3, 165 [1941]).[FN7] Notably, neither parents nor their children were represented in those placements, nor were judges involved, and there was a paucity of governmental supervision over the system (see L 1884, ch 438; Matter of Tyriek W., 85 NY2d 774, 779 [1995]). Minimal state oversight had been achieved by the establishment of the State Board of Charities, the late nineteenth century predecessor of OCFS (see generally L 1875, ch 173). Until reforms in the late twentieth century, parents who wanted to remove their children from a voluntary foster care placement were forced to navigate an informal system without counsel and with few material regulations or procedures (see generally Matter of Tyriek W., 85 NY2d at 779).
The enactment of former Social Services Law § 392 in 1970 "was intended to reform the existing State foster care system by guaranteeing that all children within that system would have their cases subjected to regular judicial oversight" (Matter of Tyriek W., 85 NY2d at 779; see L 1970, ch 742; L 1971, ch 1970). Such oversight included mandatory court reviews of all cases where a child had been in voluntary placement for at least 24 months (see Social Services Law former § 392). Additional procedural protections exist today, which include, but are not limited to, required periodic judicial review whenever a child is not residing in his or her home (see Family Ct Act § 1086), a focus on reunification (see Social Services Law §§ 358-a, 384-a), court approval for any voluntary placement of a child in excess of 30 consecutive days (see Social Services Law § 358-a), the prioritization of kinship placement and the placement of siblings together (see Social Service Law § 384-a [1-a]) and the right to counsel, which includes the appointment of legal representation for children and for parents who are financially unable to obtain representation (see Family Ct Act §§ 249 [1]; 262). While still far from perfect, statutory reforms enacted by the New York State Legislature in response to the inadequacies of prior systems for placing children serve to protect the rights and best interests of children and families.
Next, it is important to discuss the genesis of the Host Family Home program and how it took root in New York. As set forth in the record on appeal, Safe Families for Children (hereinafter SFC) describes itself as a national faith-based nonprofit organization operating chapters around the country which connect families with volunteers who agree to provide homes for children whose parents, for various reasons, are unable to care for them. In 2016, SFC first sought approval to act as an authorized agency in New York "to provide volunteers to mentor families in need or in crisis [*11]situations." OCFS advised SFC that approval was not needed to mentor families and cautioned SFC that the organization could not "place out" or "board" children in New York without prior written approval of OCFS. Thereafter, in June 2018, Laura Galt, the New York City director of SFC met with Sheila Poole, the then-Commissioner of OCFS. After this meeting, Galt sent an email to an attorney at OCFS stating that SFC was "thrilled that [Poole] is supportive of our model and taking the next steps to figure out the legal part of things." In October 2018, Galt and Renee Hallock, the Associate Commissioner of Prevention, Permanency & Program Support of OCFS, began frequent email correspondence regarding bringing the SFC model of placing children with volunteers outside of the foster care system to New York. In an October 2018 email, Hallock informed Galt that she was "wondering how other states have implemented Safe Families and what legislation or regulations did they have to put in place, if any[,] to have you do this work in their state." Subsequently, in January 2019, Hallock opined that legislation was not needed to bring about this program; rather, OCFS was looking to expand the definition of "authorized agency."[FN8]
Ultimately, expansion of the definition of "authorized agency" did not occur, through legislation or otherwise; rather, OCFS elected to go the route of implementing regulations that would allow for the SFC model in New York. In early 2019, while OCFS was drafting the Host Family Home regulations, Hallock continued to inquire as to whether Galt could provide any regulations from states that had implemented the program. Galt initially replied that, to her knowledge, "[o]ther states have passed legislation[,] but there are no state regulations in other states." Hallock replied that OCFS was "really looking for regulations." Galt later informed Hallock, by email dated February 22, 2019, that she "confirmed with [SFC's] national organization that no state has passed state regulations. We have only passed legislative change (in 14 or 15 states)."[FN9] Apparently undeterred to be the first state to do so, OCFS pushed on. Thereafter, in January 2020, OCFS published proposed regulations (see NY Reg, Jan. 29, 2020 at 1-2) to establish the Host Family Home program in New York. After a protracted comment period, in July 2021 OCFS published revised Host Family Home regulations (see NY Reg, July 7, 2021 at 7-9). After another public comment period, in December 2021 OCFS adopted the regulations as final (see 18 NYCRR 444.1-444.19).[FN10]
Touching briefly on the comments, OCFS received 137 during the first round. The comments in opposition were primarily from established organizations made up of, among others, family court judges, child welfare commissioners, foster care providers and advocates for children and parents. Some notable organizations which commented opposing the regulations in this vein include the New York State Unified Court System - Statewide Advisory [*12]Committee on Attorneys for Children, New York State Office of Court Administration - Family Court Advisory and Rules Committee, three separate committees of the New York State Bar Association, American Bar Association, New York State Defenders Association, New York State Permanent Judicial Commission on Justice for Children, Legal Aid Society of New York City - Juvenile Rights, United Family Advocates, Lawyers for Children, Legal Service of NYC, Children's Law Center and the New York State Kinship Navigator.[FN11] In contrast, the comments in support of the regulations were overwhelmingly from individuals. Due to redactions, the only thing that can be gleaned regarding these individuals is that, based on their comments, many are either volunteers or otherwise affiliated with SFC. The comments from those in opposition largely criticized the regulations as creating a "shadow foster care system" but without the protections statutorily provided to children in foster care and their parents such as judicial oversight, the right to counsel, the consideration of alternatives to placement and the provision of appropriate services. After this initial round of comments, revisions were made to the regulations, many of which further eroded the protections provided by the traditional foster care system, including removal of the prohibition of placing children outside of New York without the requirement of compliance with the Interstate Compact on the Placement of Children and a provision that parents using the Host Family Home program would sign a designation of a person in parental relation to give authority for the child's care to go directly to the host family rather than to the agency itself (see 18 NYCRR 444.5, 444.17; see also General Obligations Law art 5, title 15-A). During the second round of comments, OCFS received 85 comments. As was the case during the first round, the comments in opposition were primarily from established organizations whereas those in support were primarily from individuals. Despite the comments in opposition continuing to criticize the regulations for failing to protect children and families, no further changes were made.
With this backdrop in mind, we turn our focus to the real issue at hand; to wit, whether OCFS, in creating the Host Family Home regulations, "transgressed the line that separates administrative rule making from legislating and thereby exceeded its statutory powers" (Boreali v Axelrod, 71 NY2d 1, 16 [1987]; see Matter of Acevedo v New York State Dept. of Motor Vehs., 29 NY3d 202, 222 [2017]). Certainly, "the legislature cannot cede its fundamental policy-making responsibility to an administrative agency. Nor may an agency use its enabling statute as a basis for drafting a code embodying its own assessment of what public policy ought to be. To be sure, it is the province of the people's elected representatives, rather than appointed administrators, to resolve difficult social problems by making choices among competing [*13]ends" (Matter of Acevedo v New York State Dept. of Motor Vehs., 29 NY3d at 222 [internal quotation marks and citations omitted]).
That said, to determine whether an agency has engaged in improper policymaking, Boreali and its progeny set forth a four-part test,[FN12] which has been "distilled" by the Court of Appeals to a consideration of "whether (1) the agency did more than balance costs and benefits according to preexisting guidelines, but instead made value judgments entailing difficult and complex choices between broad policy goals to resolve social problems; (2) the agency merely filled in details of a broad policy or if it wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance; (3) the [L]egislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve; and (4) the agency used special expertise or competence in the field to develop the challenged regulation[s]" (Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 179-180 [2016] [internal quotation marks, brackets and citations omitted]; accord Matter of LeadingAge N.Y., Inc. v Shah, 32 NY3d 249, 260-261 [2018]). These "four circumstances [are not] discrete, necessary conditions that define improper policymaking by an agency, nor [are they] criteria that should be rigidly applied in every case . . . . Rather[,] . . . the circumstances [are to be treated] as overlapping, closely related factors that, taken together, support the conclusion that an agency has crossed th[e] line" (Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d 681, 696-697 [2014]; see Matter of Acevedo v New York State Dept. of Motor Vehs., 29 NY3d at 222). "Consequently, respondents may not counter petitioners' argument merely by showing that one Boreali factor does not obtain" (Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d at 697).
Beginning with the first factor, it is our opinion that OCFS acted outside its legislatively delegated authority and substituted its own value judgment regarding the provision of temporary care to families in need.[FN13] As set forth in an affidavit submitted by respondents, OCFS was on a quest to "transform and modernize New York State's child welfare system" by offering "families a reliable place to seek temporary care . . . without invasive and unnecessary engagement of the child welfare and court systems" by way of creating a novel, parallel and unauthorized voluntary foster care system. However, the Legislature has already created a voluntary foster care system by way of a carefully enacted framework of Social Services Law § 384-a which allows for the voluntary placement of children into foster care by signing custody and care of the [*14]child to OCFS. Significantly, this voluntary foster care system provides families with all of the same protections as any other placement. Pursuant to Social Services Law § 358-a, if a parent or guardian voluntarily places their child in the care and custody of social services and it is determined that the "child is likely to remain in the care of such official for a period in excess of [30] consecutive days, . . . [social services] shall petition the family court judge . . . to approve such [voluntary] instrument upon a determination that the placement of the child is in the best interest of the child, that it would be contrary to the welfare of the child to continue in his or her own home and, that where appropriate, reasonable efforts were made prior to the placement of the child into foster care to prevent or eliminate the need for removal of the child from his or her home and that prior to the initiation of the court proceeding . . . reasonable efforts were made to make it possible for the child to return safely home" (Social Services Law § 358-a [1] [a]). Prior to accepting the care and custody of a child, social services investigate possible familial resources who could care for the child and also identify any siblings who are already in care and, if so, arrange for the child to be placed with those siblings, unless such placement would be contrary to the best interests of the children (see Social Services Law § 384-a [1-a]).
Upon commencement of a proceeding, Family Court must appoint an attorney for the child to represent the child's interests and, should a parent or guardian be unable to afford legal representation, Family Court is empowered to appoint counsel to represent that parent or guardian at no cost (see Family Ct Act §§ 249, 262; Social Services Law § 358-a). Prior to approving a voluntary placement instrument, Family Court must determine, among other things, whether, "[if] appropriate, reasonable efforts were made prior to the placement of the child into foster care to prevent or eliminate the need for removal of the child" and that a parent or guardian is executing the voluntary placement instrument "knowingly and voluntarily and because he or she would be unable to make adequate provision for the care, maintenance and supervision of such child in his or her home" (Social Services Law § 358-a [1] [a]; see Social Services Law § 358-a [3] [b], [c]). Once Family Court approves a voluntary care instrument, the court maintains jurisdiction of the matter and must schedule a permanency hearing within eight months from the time the child is placed in foster care (see Social Services Law § 358-a [2-a]).[FN14] To assure that children do not languish in care without a permanency goal, permanency hearings continue for a child who remains in care every six months, and the child and parent or guardian continue to be afforded legal representation for the purpose of these permanency hearings (see Family Ct Act §§ 249, 262, 1089).
Despite this carefully [*15]crafted voluntary foster care system in which the Legislature granted numerous protections to children and parents, OCFS attempted to administratively create a separate voluntary foster care system that not only amends, but debrides the Social Services Law and the Family Court Act. In its brief on appeal, OCFS cites to multiple sources of authority and presents distinctions it asserts serve as a legitimate basis for its regulatory action. We are unpersuaded. First, we disagree that the retention of legal custody by the parent or guardian in the Host Family Home program provides a safe harbor, thus insulating the regulations from the need for the "numerous safeguards that apply to voluntary-care placements." In fact, the retention of legal custody is a chimerical distinction without a difference. Notably, legal custody is the right of a parent to make "decisions with respect to . . . important issues, such as religious training, education and medical care" (Trapp v Trapp, 136 AD2d 178, 181 [1st Dept 1988]). As a general matter, a Host Family Home placement, by regulatory design, places a child in the home of a stranger, potentially for an extended period and possibly in another state, without court oversight. The sole vehicle to effect a Host Family Home placement is the execution by the parent or guardian of "a designation of 'person in parental relation,' " in accordance with the General Obligations Law (18 NYCRR 444.5 [b]; see also General Obligations Law art 5, title 15-A), through which parental authority is relinquished to the host family in matters integral to the parenting of children.[FN15] Pursuant to General Obligations Law § 5-1555 (1), generally, a designee "shall possess all the powers and duties of a person in parental relation pursuant to [Public Health Law §§ 2164 (immunizations) and 2504 (provision of medical, dental, health, and hospital services to a child)] and [Education Law §§ 2 and 3212 (authorizing educational decisions)]." Accordingly, respondents' claim that parents do not give up their right to make fundamental decisions about their children's upbringing under the Host Family Home regulations is nothing more than form over substance. From a commonsense point of view, the host family not only has physical custody, but will make numerous everyday decisions without parental input, notwithstanding the parent retaining in-name-only legal custody.
Respondents also incorrectly assert that OCFS's authority to promulgate the Host Family Home regulations exists because the program merely "implement[s] [the] legislative policy" that underpins preventive services or amounts to respite care. However, in reality, the program is facially and substantively in conflict with the unmistakable goals of preventive services, which are designed to prevent a child's removal from their home or expedite their return (see Social Services Law §§ 409, 409-a [1] [a]). Ironically, under the Host Family Home regulations, in contrast to current law regarding [*16]voluntary placements, the Host Family Home agency has no obligation to provide preventative services prior to placing the child with strangers; rather, the agency must only inform the parent or guardian of the availability of such services (see Social Services Law §§ 358-a [1]; 384-a [2]; compare 18 NYCRR 444.4 [e]; 444.9 [a]; 444.11). In sum, the Host Family Home program does nothing to prevent the impairment or disruption of a family but instead facilitates the placement of children with strangers through a new state-run program that lacks critically important protections mandated by the Legislature when children are placed outside their home by way of voluntary placements. Respondents' argument that OCFS's authority to promulgate the Host Family Home regulations exists because the program implements legislative policy is precariously based on the unsound conclusion that avoiding any involvement with the foster care system, even on a voluntary basis, constitutes a preventive service.
Nor is the Host Family Home program by any means "respite care," which is a preventive service defined as "the temporary care and supervision of a child to relieve parents or other persons legally responsible for the care of such child where immediate relief is needed to maintain or restore family functioning" (Social Services Law § 409-a [5] [f]). 18 NYCRR 435.3 (a) specifies in what circumstances a family is eligible for respite care and services, including when "a parent is suddenly hospitalized due to accident, injury or illness" or is "participating in a substance abuse detoxification program." In conformity with the enabling legislation, the respite care regulations impose strict time limitations (see Social Services Law § 409-a [5] [a]). For example, absent "extraordinary circumstances," respite care may only be provided, for nonfoster families, for up to a maximum of seven weeks per child, per year (18 NYCRR 435.5 [c]). The Host Family Home program runs afoul of both the respite care statute and implementing regulations because it is far broader in scope, is not limited to "immediate relief," and allows a child's placement to last indefinitely, provided that the placement is renewed by the parent every six months (see 18 NYCRR 444.5 [h] [1]). As such, the Host Family Home program does not qualify as "respite care" (see 18 NYCRR 444.5) and respondents' assertions that its legislative mandate to provide respite care is a legitimate legislative tether is frankly illogical.
Indeed, it is a hallmark of agency overreach when a regulation is grounded on "administratively created exemptions rather than on rules that promote the legislatively expressed goals, since exemptions ordinarily run counter to such goals and, consequently, cannot be justified as simple implementations of legislative values" (Boreali v Axelrod, 71 NY2d at 12; see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 110 AD3d [*17]1, 10 [1st Dept 2013], affd 23 NY3d 681 [2014]). Here, OCFS has done just this by ushering in an administrative protocol based on exemptions to the statutorily enacted voluntary foster care system. As previously discussed, a comparison to the existing voluntary foster care system reveals that these exemptions create a parallel extrajudicial program bereft of many due process protections enacted by the Legislature. In essence, the Host Family Home regulations do away with fundamental protections for families and children enacted by the Legislature and deviate far from "mere implementation of the [L]egislature's chosen goal" (Matter of LeadingAge New York, Inc. v Shah, 32 NY3d at 269) and, in fact, negate that chosen goal by way of exemptions to New York's public policy. Moreover, respondents' refrain that the intent of the regulations "is not and will not be to create a new form of foster care" will fall deafly on the ears of a child placed outside of their home with strangers. In our opinion, such characterization is not only inaccurate, but also abstract and supercilious.
We now turn our attention to factor two of Boreali. It is our opinion that OCFS not only "wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance" (Boreali v Axelrod, 71 NY2d at 13), but it did so in a manner contrary to legislative intent, essentially erasing the blackboard and using new chalk. While it is true that OCFS has broad authority, such authority is limited to "fill[ing] in details and interstices and . . . mak[ing] subsidiary policy choices consistent with the enabling legislation" (Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 NY2d 398, 410 [1991] [emphasis added]; accord Matter of Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d at 700). Certainly, the agency may not implement an "entirely new rule" that "reflects a new policy choice" (Matter of Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d at 700). Stated bluntly, OCFS's broad authority to place out and/or board children does not provide it the authority to promulgate regulations establishing a parallel voluntary foster care system with significantly less guardrails than the voluntary foster care system created by the Legislature.
Lack of guardrails aside, OCFS asserts that Social Services Law § 374 (2), which codifies the right of parents to place out or board their own children, provides it with the authority to promulgate the Host Family Home regulations. To the contrary, the Host Family Home program runs afoul of this statute and is illegal. First, the parent is neither placing out nor boarding his or her child; rather, as in a voluntary placement, he or she is seeking assistance from a Host Family Home agency to place their child. The Host Family Home agency is then placing the child with a family of strangers who have [*18]been pre-selected and vetted by the agency, which is being overseen and monitored by OCFS (see 18 NYCRR 444.10, 444.11, 444.15, 444.16). However, while a Host Family Home agency is indeed an agency, it is not an "authorized agency" (see Social Services Law §§ 371 [10]), thus it cannot legally place out or board children (see Social Services Law § 374 [2]; see generally Anonymous v Anonymous, 108 Misc 2d 1098, 1103-1104 [Sup Ct, Queens County 1981]; Matter of Anonymous, 46 Misc 2d 928, 929-930 [Fam Ct, Dutchess County 1965]). Indeed, it is evident from the record that OCFS would agree that a Host Family Home agency is not an authorized agency, as it clearly informed SFC of this from the beginning. Moreover, as previously discussed herein, OCFS explored expanding the definition of "authorized agency," but ultimately declined to do so. Instead, lineit circumvented the legal definition and implemented a regulatory scheme that would not only make Host Family Home agencies ostensibly authorized agencies, but it also created an unauthorized out-of-home placement (see Social Services Law § 374).[FN16]
Additionally, as a source of legislative authority, OCFS relies upon an interpretation of title 15-a of the General Obligations Law which is both exaggerated and incorrect. This provision was enacted in 2005 to provide parents the power to designate a person in parental relation to ease the difficulties of grandparents and other nonparent caregivers in obtaining "school services and health care in a timely fashion" (Senate Introducer's Mem in Support, Bill Jacket, L 2005, ch 119 at 3).[FN17] Given that this designation is applicable to only situations surrounding school and healthcare, as well as the intent behind its enactment, it seems apparent that the provisions within title 15-a do not provide OCFS with the sweeping authority to enact a state-sponsored placement program in which children are removed from their homes and full authority for their care is transferred to strangers. "Therefore, it is clear that [OCFS] wrote the [Host Family Home regulations] without benefit of legislative guidance, and did not simply fill in details guided by independent legislation. . . . [As such,] the application of the second Boreali factor generates the same conclusion as the first factor: the adoption of the rule involved the choosing of ends, or policymaking" (Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d at 700).
As to the third factor, there has not been any activity by the Legislature as to the Host Family Home program, thus, we do not find this factor to be relevant (see generally Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d 601, 615 [2018]). Nor do we find the fourth factor to be relevant, given that OCFS exceeded its authority (see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d at 700-701[*19]). Nevertheless, it is our opinion that the Host Family Home program is invalid under Boreali by virtue of the first and second factors (see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d at 701).
In conclusion, the question at bar is not whether the Host Family Home regulations create a well-meaning program or feature certain reasonable protections as noted by the majority. In fact, we can agree that there are certainly reasons, good and bad, why families in turmoil may wish to avoid governmental entanglement when they cannot care for their children. Of course, the legislatively created voluntary foster care system is not perfect. Nevertheless, the sole question here is whether there is legitimate legislative authority and guidance underpinning these regulations, which were ushered in purposively without such legislation. In our opinion, the answer to this question is a resounding no. In fact, we would go so far as to say that OCFS has gone rogue. Indeed, not only do the Host Family Home regulations lack legislative mandate, they dispense with the hard-fought, constitutionally grounded due process rights of children who have no say as to their fate, no counsel, no permanency hearings, no judicial oversight at all and are trapped in an administrative mousetrap with no way out. What could possibly go wrong?
Ceresia, J., concurs.
ORDERED that the judgment is affirmed, without costs.

Footnotes

Footnote 1: Professor Merril Sobie has been granted leave to file a brief amicus curiae and has detailed for this Court a history of New York's voluntary foster care system.

Footnote 2: Our record contains a number of documents obtained through a Freedom of Information Law request, including the OCFS communications referenced by the dissent. While these documents provide some useful context, we do not regard them as authoritative or even necessarily complete in that respect. For this reason, and because of certain inconsistencies that we perceive among the responsive documents, we question whether this state was the first to implement the Safe Families model by way of regulation, as our dissenting colleagues assert. However, because we view resolution of that claim as peripheral to the issues before us, we do not address this in depth, but instead merely note this underlying disagreement.

Footnote 3: It is, of course, a prerequisite to such a designation that there is no prior order in effect that would prohibit the parent from exercising the same or similar authority (see General Obligations Law § 5-1551). Additionally, where a court has ordered that both parents must agree on education or health decisions regarding the child, a designation of person in parental relation is not valid unless both parents have consented to it (see General Obligations Law § 5-1551).

Footnote 4: A designation of person in parental relation notably does not impose upon the designee the duty to support the child or cause a change in the child's school district (see General Obligations Law § 5-1555 [2], [3]).

Footnote 5: Previous versions of the bill that were ultimately vetoed for flaws not relevant here were similarly intended to apply to "caregivers," "adult caregiver[s]" or "[g]randparent caregivers and other caregivers" (Senate Introducer's Mem in Support, Veto Jacket, Veto 138 of 2003 at 7; Senate Introducer's Mem in Support, Veto Jacket, Veto 1388 of 1998 at 3). 

Footnote 6: Those petitioners notably went on to take the position, with respect to General Obligations Law § 5-1551, that "[p]roviding parents and guardians with legal tools to plan for the smooth transition of care in the event of a major life disruption is a crucially important step in ensuring stability in the children's lives" (Letter from NYS Kinship Navigator et al., June 27, 2018 at 1, Bill Jacket, L 2018, ch 80 at 11).

Footnote 7: As aptly discussed by Professor Merril Sobie in the brief amicus curiae, this "scheme" bears a resemblance to the Host Family Home program as it "similarly replaces foster care obligations and expenses with unpaid informal placement devoid of reimbursement or services."

Footnote 8: Pursuant to Social Services Law § 371 (10), an authorized agency, as relevant here, is "[a]ny agency, . . . which is incorporated or organized under the laws of this state with corporate power or empowered by law to care for, to place out or to board out children" (Social Services Law § 371 [10] [a]).

Footnote 9: Notably, whether the Host Family Home program could be enacted through legislation is irrelevant since the question here is whether the Host Family Home program placing children could be enacted in a regulatory context.

Footnote 10: The majority notes that "the challenged program was inspired by a model preventive service, which, according to the record before us, has been implemented in 38 states" (majority op at ___). The record does not, however, reveal how many states have implemented programs which involve placing children, such as the Host Family Home program, or how many have implemented other types of programs which feature ancillary services that do not involve placing children. Indeed, the latter was already being provided by SFC in New York, as detailed in the aforementioned 2016 application to act as an authorized agency "to provide volunteers to mentor families in need or in crisis situations."
Footnote 11: Certainly, had OCFS proposed the Host Family Home program by way of legislation, the litany of issues raised by these many stakeholders opposing the program render questionable the likelihood of the passage of such legislation in its current iteration.

Footnote 12: The Boreali analysis has been criticized. Interestingly, one such criticism concisely and precisely supports petitioners' view here that the regulations are ultra vires. As noted by Judge Wilson in Matter of LeadingAge N.Y., Inc. v Shah, "[a] better view. . . is to say that while the executive may consider and advance its own policy goals in executing the laws, it may not execute the laws in a manner, or with a result, objectively inconsistent with the policy goals articulated, expressly or implicitly, in the legislation that purportedly authorizes that action" (32 NY3d 249, 289 [2018, Wilson, J., dissenting] [emphasis added]). With this criticism and crystallization framing the Boreali analysis, we will proceed.
Footnote 13: This value judgment is clearly demonstrated in an email written by Hallock, whose primary role was to administer child welfare laws. In this email, in response to a question by Galt at SFC as to whether families could simply use the existing voluntary placement procedure codified in Social Services Law § 384-a, Hallock replied, "[y]es[,] parents do use them, but why should they have to." Of course, one reason is that it is the law and OCFS has a duty to enforce it. Also demonstrating the value judgment made in promulgating these regulations, Hallock stated, again referring to the statutory foster care system she is tasked with enforcing, to Galt at SFC, "[w]e can do better, we must do better. I will continue to fight for your type of program." When Galt inquired as to Hallock's pending retirement, Hallock stated that she was "not leaving at this time, and won't leave until I get [the Host Family Home program] across the finish line. I firmly believe this is what families need."

Footnote 14: This is it not to say that a child must remain in care for eight months, or until the time of the first permanency hearing (see Social Services Law § 384-a [2] [a]).

Footnote 15: We note that the reliance on the designation of a person in parental relation form (see General Obligations Law art 5, title 15-A) is curious given that this form had no place in the first iteration of the program (see NY Reg, Jan. 29, 2020 at 1-2), but rather was added after the first comment period (see NY Reg, July 7, 2021 at 7-9).

Footnote 16: Social Services Law §§ 374-B through 374-F list specific kinds of out-of-home placements that are permitted. Notably, placements in a Host Family Home is not listed as a statutorily authorized out-of-home placement (see Social Services Law §§ 374-B through 374-F).

Footnote 17: Title 15-a of the General Obligations Law was amended in 2018 to "extend the time periods [from 6 months to 12 months] in which a parent or guardian may designate a caregiver as a person in parental relation[ ] to better reflect the realities of kinship caregiving" (Assembly Mem in Support, Bill Jacket, L 2018, ch 80 at 6). The driving force behind this amendment was to make it easier for undocumented parents and caregivers to prepare for the possibility of "sudden detention or deportation" (Assembly Mem in Support, Bill Jacket, L 2018, ch 80 at 7).